## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

JULIAN FERNAU, FERNANDO
MATEU, AND MARIA DOLORES
DE LUCAS,

     *Plaintiffs*,

  v.

ENCHANTE BEAUTY PRODUCTS,
INC., RAUL LAMUS, AND MARIA
FERNANDA REY,

     *Defendants*.

CASE NO. 1:18-cv-20866-RNS

REQUEST FOR JURY TRIAL

## <u>VERIFIED SECOND AMENDED COMPLAINT</u>

COME NOW, Plaintiffs, Julian Fernau, Fernando Mateu, and Maria Dolores de Lucas and file this civil complaint against Defendants, Enchante Beauty Products, Inc., Raul Lamus, and Maria Fernanda Rey.

### JURISDICTION AND VENUE

1.     This Court has original jurisdiction pursuant to 28 U.S.C. §1331. This is a civil action arising under the Constitution, laws, or treaties of the United States. The Court also has exclusive jurisdiction pursuant to §27 of the Securities Exchange Act of 1934 ("**Exchange Act**"), 15 U.S.C. §78aa, because this civil action involves violations of the rules and regulations thereunder.

2.    This Court further has supplemental jurisdiction under 28 U.S.C. §1367 over all other claims herein because such claims form part of the same case or controversy.

3.    Personal jurisdiction over Defendants is present in the State of Florida in accordance with Fla. Stat. §48.193.  Defendants have (i) operated, conducted, engaged in, or carried on a business or business venture in this state or had an office or agency in this state, (ii) have committed a tortious act within this state, and (iii) have engaged in substantial and not isolated activity within this state. Further, personal jurisdiction is established under §27 of the Exchange Act, 15 U.S.C. §78aa.  Defendants can be found, inhabit, or transact business within the Southern District of Florida.

4.    Venue is proper in this district pursuant to 28 U.S.C. §1391(b).  The Southern District of Florida is the judicial district in which a substantial part of the events or omissions giving rise to the claims occurred.  Further, Enchante is deemed a resident of this District.

## PARTIES

5.    Enchante Beauty Products, Inc. ("**Enchante**") is a Florida profit corporation with its principal place of business located at 8600 NW South River Drive, Suite 215, Medley, FL 33166.  Enchante was formed on November 9, 2015

in the State of Florida.  On January 6, 2016, Beauty Care Partners Strategic

Channels, Inc., a Delaware corporation, was merged into Enchante.

6.     Raul Lamus ("**Lamus**") was the chief executive officer and a director

of Enchante.  Upon information and belief, Lamus, as of March 7, 2018 (date of

filing of the Complaint), was a foreign resident in Spain.  During the time of the

relevant facts to this Complaint, Lamus resided in Miami, Florida.

7.     Maria Fernanda Rey ("**Rey**") is the wife of Mr. Lamus and is believed

to have resided with him in Madrid, Spain from June of 2017 through the date of

joinder of Mrs. Rey as a party to this litigation.

8.     Julian Fernau ("**Fernau**") is a resident of Miami-Dade County,

Florida.

9.     Fernando Mateu and Maria Dolores De Lucas ("jointly referred to

herein as **Mateu**") are husband and wife and reside in Miami-Dade County,

Florida.

## FACTUAL BACKGROUND

10.     This lawsuit is a civil action for violation of the state and federal

securities laws.  Lamus and Rey, husband and wife, orchestrated a fraud by way of

material misstatements and omissions in connection with the sale of the securities

of Enchante.  Plaintiffs further raise one count under the Florida Civil Remedies

for Criminal Practices Act or the "Florida Civil RICO" for Defendants' association

in fact in a criminal enterprise and corresponding violations of the Florida Securities and Investor Protection Act.

### 2015 Sales of Securities to Fernando Mateu and Maria Dolores de Lucas

11.     In August of 2015, Lamus and Rey solicited Mateu for the investment of one hundred thousand dollars ($100,000.00) into Enchante.[1]  The investment was solicited with material misstatements and omissions in violation of both state and federal securities laws.

12.     The misrepresentations and omissions occurred on or about August 5, 2015.  Rey first presented the success of Enchante and its cosmetics business to Mateu.  Lamus subsequently organized two in-person meetings in Miami for the purpose of solicitation and sale of the investment to Mateu.

13.     In soliciting the investment to Mateu, Lamus and Rey relied upon the means and instrumentality of interstate commerce, including wire communications. Communications were made by telephone and electronic instant messaging, in and around August of 2015, to promote Enchante and the sale of the investment to Mateu.

14.     Although the subscription agreement states that Mateu had been provided with "an opportunity to discuss with management of the Company and to

---

[1] A copy of the subscription agreement for securities appears as Docket Number 20-1.

ask questions about the Company's current and prospective financial condition, assets and liabilities, business operations, sales, sales prospects, strategic initiatives and business plans," the information provided by Lamus and Rey was materially false and misleading and they omitted to disclose all material information in connection with the sale of the securities.  Such misrepresentations and omissions included:

A. Enchante was an established, operating business generating substantial cash flows.

B. The company was approximately breaking even financially with revenues meeting expenses.

C. A six to eight percent (6 – 8%) dividend would be expected for 2016.

D. The company reached a valuation of between one million two hundred fifty thousand dollars ($1,250,000.00) and two million three hundred thousand dollars ($2,300,000.00).

E. The use of proceeds of Mateu's investment would primarily be used to fund Enchante's operations and not paid out to Lamus personally.

F. Enchante already had substantially more investment committed by other parties.

15.    The foregoing statements were false.  Enchante was a startup business.  Cash flows were negative and the survival of the company relied upon

use of new investors' funds.  Enchante was experiencing heavy financial losses.

No dividend could or would be declared.  This business valuation was grossly

inflated and did not rely upon any recognized valuation methodology.  Lamus and

Rey intended to use Mateu's investment funds for their personal benefit.

16.     In connection with the sale of the securities to Mateu, Defendants

relied upon a document entitled Investment Memo, Executive Summary or a

document similar thereto.[2]  The disclosures contained in the document were

materially false and misleading and/or the document contained forecasts and

assumptions which lacked any reasonable basis in fact.  Such misrepresentations

and omissions included:

A. The business provided approximately thirty percent (~30%) operating

profit and strong free cash flow of about twenty percent (~20%).

B. Over eight hundred sixty thousand dollars ($860,000.00) was invested

on or before August of 2015 into Enchante.

C. Investors should expect full payback or return of their capital within

fifty (50) months, including dividend payouts of two million dollars

($2,000,000.00) per year by 2019.

D. The business would reasonably reach a valuation of thirty-eight to

fifty-two million dollars ($38,000,000.00 - 52,000,000.00).

---

[2] A copy of the Investment Memo, Executive Summary is attached as Exhibit "A."

E.  That sales should be expected per salon conservatively of two thousand dollars ($2,000.00) per month, with the better producing salons to exceed ten thousand dollars ($10,000.00) per month.

F.  That the company could be expected to deliver over one hundred million dollars ($100,000,000.00) in revenue within ten (10) years.

G.  Because of a lean organizational structure, positive cash flow would be expected within six (6) months.

H.  That the "project has attractive investment considerations that provide significant upside potential at minimum risk."

I.  The company yields large cash flows, very high returns, and has great scalability.

J.  Fundraising will be mostly allocated to working capital, hiring personnel, and marketing; thus "limiting any risk."

K.  Revenue forecasts were made of ten million ($10,000,000.00) and thirty million dollars ($30,000,000.00) in years three (3) and four (4), respectively.

L.  Operating profit forecasts were made of two million ($2,000,000.00) and seven million dollars ($7,000,000.00) in years three (3) and four (4), respectively.

M. Three hundred thousand dollars ($300,000.00) was already committed in the current round of capital raising.

N. An expected return of five times (5x) could be achieved within five (5) years.

O. The use of funds would include six hundred thousand dollars ($600,000.00) into the development of a Florida flagship store and two hundred thousand dollars ($200,000.00) into new product.

17.     Upon information and belief, the foregoing representations were false and/or materially misleading.  Enchante had never reached a point of profitability. It was therefore unreasonable to expect any substantial returns or dividends in the foreseeable future, much less support the multi-million dollar valuations Lamus presented.  The use of proceeds was not accurately described.  Instead, investor funds were distributed to pay for such items as Lamus' personal salary, lavish travel expense, and personal meals and entertainment.  The eight hundred sixty thousand dollars ($860,000.00) of purported invested capital, as of August 2015, was not true.  Sales per salon had not "conservatively" reached two thousand dollars ($2,000.00) per month nor the ten thousand dollars ($10,000.00) per month represented.  The purported Florida flag ship store was never created nor was two hundred thousand dollars ($200,000.00) invested into new product.

18.     In connection with the sale of the securities to Mateu, Defendants relied upon a document entitled Strategic Channels NWA Presentation or a document similar thereto.[3]  The disclosures contained in the document were materially false and misleading and/or the document contained forecasts and assumptions which lacked any reasonable basis in fact.  Such misrepresentations and omissions included:

A.  Sales were expected to reach three million dollars ($3,000.000.00) in 2017 and twenty-six million dollars ($26,000,000.00) in 2019.

B.  After tax profit was expected to reach six hundred thousand dollars ($600,000.00) in 2017 and six million seven hundred thousand dollars ($6,700,000.00) in 2019.

C.  Cash flows were expected to reach four hundred thousand dollars ($400,000.00) in 2017 and five million seven hundred thousand dollars ($5,700,000.00) in 2019.

D.  Dividends were expected to be paid in the amounts of four hundred thousand dollars ($400,000.00) in 2017 and three million seven hundred thousand dollars ($3,700,000.00) in 2019.

---

[3] A copy of the Strategic Channels NWA Presentation is attached as Exhibit "B."

E.  The results identified in subparagraphs A through D could be achieved with only one million four hundred thousand dollars ($1,400,000.00) of invested capital.

F.  Valuations could be supported with a thirty-eight percent (38%) discounted cash flow rate.

G.  The company carried a two million three hundred thousand ($2,300,000.00) pre-money valuation in 2015.

H.  Investors could expect a five times (5x) return in only five (5) years.

I.  That the use of proceeds would include five hundred thousand dollars ($500,000.00) into product inventory and store development in Florida, New York, Massachusetts, and Louisiana, one hundred fifty thousand dollars ($150,000.00) into a Florida flagship academy, one hundred fifty thousand dollars ($150,000.00) into a Colombia and second flagship store, and two hundred thousand dollars ($200,000.00) into development of distribution channels through luxury department stores.

J.  The company could become a one hundred-million-dollar ($100,000,000.00) distribution business in the Americas within five (5) years.

K.  Thirty percent (30%) operating profit could be expected.

19.     Upon information and belief, the foregoing representations were materially false and misleading when made.  The revenue and profitability forecasts, as well as the corresponding company valuations, did not rely upon any recognized methodology or reasonable assumptions.  Enchante had never reached a point of profitability.  It was therefore unreasonable to expect payment of dividends to investors in the foreseeable future.  The use of proceeds was not accurately described.  Five hundred thousand dollars ($500,000.00) was not invested into product inventory nor was an additional one hundred fifty thousand dollars ($150,000.00) invested for the creation of any flagship store in either the United States or abroad.  Two hundred thousand dollars ($200,000.00) was not invested into the development of distribution channels through luxury department stores.

20.     Lamus and Rey were aware of the poor financial performance of Enchante at the time of sale, or were severely reckless in not knowing, but failed to disclose the particular risk factors to Mateu as well as those negative events that had already materialized by August of 2015.

21.     In December of 2015, Lamus and Rey solicited Mateu for an additional investment of six thousand dollars ($6,000) into Enchante.[4]

---

[4] A copy of the securities purchase agreement appears in the Docket under number 20-2.

22.     The investment was also solicited with material misstatements and omissions.  Both Lamus and Rey were aware, or were severely reckless in not knowing, of the poor and deteriorating financial condition of Enchante in December of 2015, but failed to disclose that information at the time of the sale of the securities to Mateu.

23.     Among such misrepresentations and omissions, Lamus and Rey were aware of the substantial losses being incurred by Enchante in 2015.  They further failed to correct their misrepresentations and omissions made in August of 2015 regarding the success of Enchante.

### 2017 Sale of Securities to Julian Fernau

24.     Between February and March of 2017, Lamus solicited Fernau for the investment of sixty-two thousand five hundred dollars ($62,500.00) into Enchante.[5]

25.     Much the same as Mateu, the Fernau investment was solicited and sold with material misstatements and omissions of material fact.  Lamus was aware of the poor and deteriorating financial performance of Enchante and substantial, unpaid liabilities, but failed to disclose this information at the time of the sale of the securities.

---

[5] A copy of the March 29, 2017 subscription agreement appears under Docket Number 20-3.

26.     Although the subscription agreement states that Fernau had been provided with "access to all information, including financial statements and other financial information of the Company, and has been afforded an opportunity to ask questions of and receive answers from the Company," the information he had received from Lamus, on behalf of Enchante, was false and materially misleading. These misrepresentations and omissions included:

A. Lamus represented that Enchante was at a break-even point financially whereby revenues were approximately equal to expenses being incurred.

B. Lamus failed to disclose material liabilities Enchante had when he solicited and sold the investment.

C. Lamus misrepresented the existence of sales of Enchante as a result of one or more consignment agreements.  These consignment agreement(s) were structured whereby Enchante would provide its inventory to be held in retail stores, but such were neither sales nor should have been counted as revenue when the product was delivered.

D. Lamus represented that Enchante, at the time of sale, had a valuation of one million two hundred fifty thousand dollars ($1,250,000.00) or more.

E. Lamus failed to disclose that the financial statements of Enchante did not comport with Generally Accepted Accounting Principles (GAAP).

F.  Lamus failed to disclose problems in Enchante's sales and distribution structure.

G. Lamus failed to disclose that on or about October 17, 2016, Fernando Mateu and his wife requested rescission of their 2015 securities purchases.

H. Lamus failed to disclose that in response to the October 17, 2016 request for rescission by Mateu, Lamus disclosed the lack of liquidity and insolvency of Enchante and sought to payback Mateu's investment with the use of new investors' funds.

27.     The foregoing statements were false and/or materially misleading. Enchante was incurring substantial losses when the sale of the securities occurred. Enchante had unpaid and substantial liabilities, including unpaid taxes in Colombia, unpaid accounts payable and royalties to Enchante's primary supplier, La Biothetique, and amounts claim by Lamus himself for back due salaries and expenses.  The consignment arrangements resulted in inflated revenue because sales were recognized when product was shipped, but retail stores had no obligation to pay for the products prior to their sale to the end-user or customer. The business valuation was grossly inflated and did not rely upon any recognized valuation methodology or reasonable valuation assumptions.  Lamus knew, at the time of the sale of the securities, that the company had engaged in questionable

sales practices.  These questionable sales practices involved the sale of goods on credit to retailers which were either a poor credit risk or known to be uncollectible.

28.     In soliciting the investment to Fernau, Lamus provided, in a March 1, 2017 email communication,[6] that:

A. Enchante had a one million two hundred fifty thousand dollar ($1,250,000.00) valuation.

B. At least fifty percent (50%) of the initial investment by Fernau would remain in the company.

29.     The foregoing statements were false and materially misleading when made.  This valuation was grossly inflated and did not rely upon any recognized valuation methodology or reasonable assumptions.  Fifty percent (50%) of the initial investment did not remain within the company, but was quickly spent, including for payment of such items as Lamus' claims for past due personal salary and expenses.

30.     In the sale of securities to Fernau, Lamus distributed, on March 3, 2017, a copy of the Investment Memo, Executive Summary, the same or similar as was presented to Mateu.  The disclosures contained in the document were materially false and misleading and/or the document contained forecasts and

---

[6] A copy of the March 1, 2017 email communication is attached as <u>Exhibit "C."</u>

assumptions which lacked any reasonable basis in fact.  Such misrepresentations and omissions included:

A.  The business provides approximately thirty percent (~30%) operating profit and strong free cash flow of about twenty percent (~20%).

B.  Over eight hundred sixty thousand dollars ($860,000.00) was invested on or before August of 2015 into Enchante.

C.  That investors should expect full payback or return of their capital within fifty (50) months, including dividend payouts of two million dollars ($2,000,000.00) per year by 2019.

D.  The business would reach a valuation of thirty-eight to fifty-two million dollars ($38,000,000.00 - $52,000,000.00).

E.  That sales should be expected per salon conservatively of two thousand dollars ($2,000.00) per month, with the better producing salons to exceed ten thousand dollars per month ($10,000.00).

F.  That the company could be expected to deliver over one hundred million dollars ($100,000,000.00) in revenue within ten (10) years.

G.  Because of a lean organizational structure, positive cash flow would be expected within six (6) months.

H.  That the "project has attractive investment considerations that provide significant upside potential at minimum risk."

I.   The company yields large cash flows, very high returns, and has great scalability.

J.   Fundraising would be mostly allocated to working capital, hiring personnel, and marketing; thus "limiting any risk."

K.  Revenue forecasts were made of ten million ($10,000,000.00) and thirty million dollars ($30,000.000.00) in years three (3) and four (4), respectively.

L.   Operating profit forecasts were made of two million ($2,000,000.00) and seven million dollars ($7,000,000.00) in years three (3) and four (4), respectively.

M. Three hundred thousand dollars ($300,000.00) was already committed in the current round of capital raising.

N.  An expected return of five times (5x) could be achieved within five (5) years.

O.  The use of funds would include six hundred thousand dollars ($600,000.00) into the development of a Florida flagship store and two hundred thousand dollars ($200,000.00) into new product.

31.   By March of 2017, Enchante was already on the verge of collapse. Not only were the foregoing statements false and materially misleading when made, but by 2017, it was known that such statements had no reasonable basis in

fact.  Enchante had never reached a point of profitability for which dividends could

be paid.  Per store sales were dismissal and nowhere near the two thousand

($2,000.00) to ten thousand dollar ($10,000.00) per month estimates.  The use of

proceeds did not follow the representations made and instead, Lamus received

substantial payments from Enchante for his personal salary, lavish travel, and

meals and entertainment.

    32.    On March 6, 2017, Lamus, in soliciting the investment to Fernau,

made additional statements which were false and/or Lamus was reckless when

making such statements.[7]  Such false statements and/or misstatements included:

    A. Based on an initial investment of one hundred twenty-five thousand

    dollars ($125,000.00), Mr. Fernau could expect a forty-five to seventy

    percent (45-70%) cumulative annual growth rate and return of two hundred

    fifty-six thousand ($256,000.00) to four hundred ninety-three thousand

    dollars ($493,000.00) in three (3) years.

    B. Mr. Fernau, in addition to the growth rate of the investment, could

    expect ten percent (10%) annual returns by dividends.

    C. In a "base case scenario," Enchante would have a valuation of over

    two million nine hundred thousand dollars ($2,900,000.00) and, in a "best

_____

[7] A copy of the March 6, 2017 email communication is attached as <u>Exhibit "D."</u>

case scenario," that valuation would rise to almost four million dollars ($4,000,000.00) in three (3) years.

33.    By 2017, Enchante had nominal value because of its mounting liabilities.  Lamus was personally aware of the impossibility of reaching his prior sales and growth forecasts, yet continued to make such unsupportable representations to Fernau.

34.    Although the present litigation involves Defendants' fraudulent sales of Enchante securities to the three Plaintiffs, the scheme to defraud and criminal enterprise extended between approximately 2012 and 2017 and included Enchante's affiliate and predecessor, Beauty Care Partners Strategic Channels, Inc. Upon information and belief, other Enchante equity and debt holders were similarly sold investment securities by Defendants with use of fraudulent statements and/or omissions of material fact.  Such defrauded parties are believed to include Alejandro Marmorek, Gustavo Souss, and Ruy Chaves of Bratcher Consultants, Inc.

## COUNT I
## RESCISSION UNDER THE FLORIDA SECURITIES AND
## INVESTOR PROTECTION ACT
## (FLA STAT. §517.211)
(Mateu vs. All Defendants)

35.    The allegations contained in paragraphs 1 through 34 are hereby incorporated by reference as if such were restated in full.

36.     Pursuant to Fla. Stat. §517.211(2), any person purchasing or selling a security in violation of §517.301, and every director, officer, partner, or agent of or for the purchaser or seller, if the director, officer, partner, or agent has personally participated or aided in making the sale or purchase, is jointly and severally liable to the person selling the security to or purchasing the security from such person in an action for rescission.

37.     Fla. Stat. §517.211(6) provides that in any action brought under §517.211, including an appeal, the court shall award reasonable attorneys' fees to the prevailing party unless the court finds that the award of such fees would be unjust.

38.     The statute of limitations for actions under Chapter 517 of the Florida Statutes is set forth in Fla. Stat. §95.11(4)(e).  Such provides a two (2) year statute of limitations with the period running from the time the facts giving rise to the cause of action were discovered, or should have been discovered with the exercise of due diligence, but not more than five (5) years from the date such violation occurred.

39.     Fla. Stat. §517.301 provides that it is unlawful and a violation of Chapter 517 of the Florida Code for a person, in connection with the offer, sale, or purchase of any investment or security (i) to employ any device, scheme, or artifice to defraud, (ii) to obtain money or property by means of any untrue statement of a

material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (iii) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a person.

40.    Lamus, Rey, and Enchante, by and through Lamus as chief executive officer and a director and Rey as sales agent of securities, violated §517.301 because they, in connection with the sale of a security, (i) employed a device, scheme, or artifice to defraud, (ii) obtained money or property by means of untrue statements of material fact and omissions to state material facts, and (iii) engaged in a transaction, practice, or course of business which operated as a fraud or deceit upon Mateu.

41.    In August of 2015, Lamus and Rey solicited Mateu for the investment of one hundred thousand dollars ($100,000.00) into Enchante.  The investment was solicited with material misstatements and omissions in violation of both state and federal securities laws.

42.    The misrepresentations and omissions occurred on or about August 5, 2015.  Rey first presented the success of Enchante and its cosmetics business to Mateu.  Lamus subsequently organized two in-person meetings in Miami for the purpose of solicitation and sale of the investment to Mateu.

43.     In soliciting the investment to Mateu, Lamus and Rey relied upon the means and instrumentality of interstate commerce, including wire communications. Communications were made by telephone and electronic instant messaging, in and around August of 2015, to promote Enchante and the sale of the investment to Mateu.

44.     Although the subscription agreement states that Mateu had been provided with "an opportunity to discuss with management of the Company and to ask questions about the Company's current and prospective financial condition, assets and liabilities, business operations, sales, sales prospects, strategic initiatives and business plans," the information provided by Lamus and Rey was materially false and misleading and they omitted to disclose all material information in connection with the sale of the securities.  Such misrepresentations and omissions included:

A. Enchante was an established, operating business generating substantial cash flows.

B. The company was approximately breaking even financially with revenues meeting expenses.

C. A six to eight percent (6 – 8%) dividend would be expected for 2016.

D. The company reached a valuation of between one million two hundred fifty thousand dollars ($1,250,000.00) and two million three hundred thousand dollars ($2,300,000.00).

E. The use of proceeds of Mateu's investment would primarily be used to fund Enchante's operations and not paid out to Lamus personally.

F. Enchante already had substantially more investment committed by other parties.

45.     The foregoing statements were false.  Enchante was a startup business.  Cash flows were negative and the survival of the company relied upon use of new investors' funds.  Enchante was experiencing heavy financial losses. No dividend could or would be declared.  This business valuation was grossly inflated and did not rely upon any recognized valuation methodology.  Lamus and Rey intended to use Mateu's investment funds for their personal benefit.

46.     In connection with the sale of the securities to Mateu, Defendants relied upon a document entitled Investment Memo, Executive Summary or a document similar thereto.  The disclosures contained in the document were materially false and misleading and/or the document contained forecasts and assumptions which lacked any reasonable basis in fact.  Such misrepresentations and omissions included:

A. The business provided approximately thirty percent (~30%) operating profit and strong free cash flow of about twenty percent (~20%).

B. Over eight hundred sixty thousand dollars ($860,000.00) was invested on or before August of 2015 into Enchante.

C. Investors should expect full payback or return of their capital within fifty (50) months, including dividend payouts of two million dollars ($2,000,000.00) per year by 2019.

D. The business would reasonably reach a valuation of thirty-eight to fifty-two million dollars ($38,000,000.00 - 52,000,000.00).

E. That sales should be expected per salon conservatively of two thousand dollars ($2,000.00) per month, with the better producing salons to exceed ten thousand dollars ($10,000.00) per month.

F. That the company could be expected to deliver over one hundred million dollars ($100,000,000.00) in revenue within ten (10) years.

G. Because of a lean organizational structure, positive cash flow would be expected within six (6) months.

H. That the "project has attractive investment considerations that provide significant upside potential at minimum risk."

I. The company yields large cash flows, very high returns, and has great scalability.

J.   Fundraising will be mostly allocated to working capital, hiring personnel, and marketing; thus "limiting any risk."

K.   Revenue forecasts were made of ten million ($10,000,000.00) and thirty million dollars ($30,000,000.00) in years three (3) and four (4), respectively.

L.   Operating profit forecasts were made of two million ($2,000,000.00) and seven million dollars ($7,000,000.00) in years three (4) and four (4), respectively.

M.  Three hundred thousand dollars ($300,000.00) was already committed in the current round of capital raising.

N.   An expected return of five times (5x) could be achieved within five (5) years.

O.   The use of funds would include six hundred thousand dollars ($600,000.00) into the development of a Florida flagship store and two hundred thousand dollars ($200,000.00) into new product.

47.     Upon information and belief, the foregoing representations were false and/or materially misleading.  Enchante had never reached a point of profitability. It was therefore unreasonable to expect any substantial returns or dividends in the foreseeable future, much less support the multi-million dollar valuations Lamus presented.  The use of proceeds was not accurately described.  Instead, investor

funds were distributed to pay for such items as Lamus' personal salary, lavish travel expense, and personal meals and entertainment.  The eight hundred sixty thousand dollars ($860,000.00) of purported invested capital, as of August 2015, was not true.  Sales per salon had not "conservatively" reached two thousand dollars ($2,000.00) per month nor the ten thousand dollars ($10,000.00) per month represented.  The purported Florida flag ship store was never created nor was two hundred thousand dollars ($200,000.00) invested into new product.

48.     In connection with the sale of the securities to Mateu, Defendants relied upon a document entitled Strategic Channels NWA Presentation or a document similar thereto.  The disclosures contained in the document were materially false and misleading and/or the document contained forecasts and assumptions which lacked any reasonable basis in fact.  Such misrepresentations and omissions included:

A. Sales were expected to reach three million dollars ($3,000.000.00) in 2017 and twenty-six million dollars ($26,000,000.00) in 2019.

B. After tax profit was expected to reach six hundred thousand dollars ($600,000.00) in 2017 and six million seven hundred thousand dollars ($6,700,000.00) in 2019.

C.  Cash flows were expected to reach four hundred thousand dollars ($400,000.00) in 2017 and five million seven hundred thousand dollars ($5,700,000.00) in 2019.

D. Dividends were expected to be paid in the amounts of four hundred thousand dollars ($400,000.00) in 2017 and three million seven hundred thousand dollars ($3,700,000.00) in 2019.

E.  The results identified in subparagraphs A through D could be achieved with only one million four hundred thousand dollars ($1,400,000.00) of invested capital.

F.  Valuations could be supported with a thirty-eight percent (38%) discounted cash flow rate.

G.  The company carried a two million three hundred thousand ($2,300,000.00) pre-money valuation in 2015.

H.  Investors could expect a five times (5x) return in only five (5) years.

I.  That the use of proceeds would include five hundred thousand dollars ($500,000.00) into product inventory and store development in Florida, New York, Massachusetts, and Louisiana, one hundred fifty thousand dollars ($150,000.00) into a Florida flagship academy, one hundred fifty thousand dollars ($150,000.00) into a Colombia and second flagship store, and two

hundred thousand dollars ($200,000.00) into development of distribution channels through luxury department stores.

J.  The company could become a one hundred-million-dollar ($100,000,000.00) distribution business in the Americas within five (5) years.

K.  Thirty percent (30%) operating profit could be expected.

49.    Upon information and belief, the foregoing representations were materially false and misleading when made.  The revenue and profitability forecasts, as well as the corresponding company valuations, did not rely upon any recognized methodology or reasonable assumptions.  Enchante had never reached a point of profitability.  It was therefore unreasonable to expect payment of dividends to investors in the foreseeable future.  The use of proceeds was not accurately described.  Five hundred thousand dollars ($500,000.00) was not invested into product inventory nor was an additional one hundred fifty thousand dollars ($150,000.00) invested for the creation of any flagship store in either the United States or abroad.  Two hundred thousand dollars ($200,000.00) was not invested into the development of distribution channels through luxury department stores.

50.    Lamus and Rey were aware of the poor financial performance of Enchante at the time of sale, or were severely reckless in not knowing, but failed to

disclose the particular risk factors to Mateu as well as those negative events that had already materialized by August of 2015.

51.   In December of 2015, Lamus and Rey solicited Mateu for an additional investment of six thousand dollars ($6,000) into Enchante.

52.   The investment was also solicited with material misstatements and omissions.  Both Lamus and Rey were aware, or were severely reckless in not knowing, of the poor and deteriorating financial condition of Enchante in December of 2015, but failed to disclose that information at the time of the sale of the securities to Mateu.

53.   Among such misrepresentations and omissions, Lamus and Rey were aware of the substantial losses being incurred by Enchante in 2015.  They further failed to correct their misrepresentations and omissions made in August of 2015 regarding the success of Enchante.

54.   Had Lamus made full and accurate disclosure at the time of the sale of the securities, Mateu would not have invested into the company.  Mateu's reliance was also reasonable.  Lamus was the chief executive officer and a director and therefore had access to the books and records of Enchante.  Rey is Lamus' wife and functioned as a sales agent and promotor of her husband's company.

55.   The untrue statements and omissions of material fact were the proximate cause of Mateu's loss.  Due to the poor financial state of the company,

Enchante failed within approximately two (2) years of Mateu's investment. Among other factors, the failure to use the proceeds as intended resulted in excessive payments to Lamus and Rey, as opposed to product inventory, store development, and the creation of product distribution channels.

56.     This cause of action is brought within the statute of limitations period set forth under Fla. Stat. §95.11(4)(e) because it was filed within two (2) years of the time that the facts giving rise to the cause of action were discovered, or should have been discovered with the exercise of due diligence, and within five (5) years of the date of violation.  Mateu discovered the facts surrounding Defendants' misrepresentations and omissions on or after October of 2016.

**COUNT II**
**RESCISSION UNDER THE FLORIDA SECURITIES AND**
**INVESTOR PROTECTION ACT**
**(FLA STAT. §517.211)**
(Fernau vs. Lamus and Enchante)

57.     The allegations contained in paragraphs 1 through 34 are hereby incorporated by reference as if such were restated in full.

58.     Pursuant to Fla. Stat. §517.211(2), any person purchasing or selling a security in violation of §517.301, and every director, officer, partner, or agent of or for the purchaser or seller, if the director, officer, partner, or agent has personally participated or aided in making the sale or purchase, is jointly and severally liable

to the person selling the security to or purchasing the security from such person in an action for rescission.

59.     Fla. Stat. §517.211(6) provides that in any action brought under §517.211, including an appeal, the court shall award reasonable attorneys' fees to the prevailing party unless the court finds that the award of such fees would be unjust.

60.     The statute of limitations for actions under Chapter 517 of the Florida Statutes is set forth in Fla. Stat. §95.11(4)(e).  Such provides a two (2) year statute of limitations with the period running from the time the facts giving rise to the cause of action were discovered, or should have been discovered with the exercise of due diligence, but not more than five (5) years from the date such violation occurred.

61.     Fla. Stat. §517.301 provides that it is unlawful and a violation of Chapter 517 of the Florida Code for a person, in connection with the offer, sale, or purchase of any investment or security (i) to employ any device, scheme, or artifice to defraud, (ii) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (iii) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a person.

62.     Lamus and Enchante, by and through Lamus as chief executive officer and a director, violated §517.301 because they, in connection with the sale of a security, (i) employed a device, scheme, or artifice to defraud, (ii) obtained money or property by means of untrue statements of material fact and omissions to state material facts, and (iii) engaged in a transaction, practice, or course of business which operated as a fraud or deceit upon Fernau.

63.     Between February and March of 2017, Lamus solicited Fernau for the investment of sixty-two thousand five hundred dollars ($62,500.00) into Enchante.

64.     Much the same as Mateu, the Fernau investment was solicited and sold with material misstatements and omissions of material fact.  Lamus was aware of the poor and deteriorating financial performance of Enchante and substantial, unpaid liabilities, but failed to disclose this information at the time of the sale of the securities.

65.     Although the subscription agreement states that Fernau had been provided with "access to all information, including financial statements and other financial information of the Company, and has been afforded an opportunity to ask questions of and receive answers from the Company," the information he had received from Lamus, on behalf of Enchante, was false and materially misleading. These misrepresentations and omissions included:

A. Lamus represented that Enchante was at a break-even point financially whereby revenues were approximately equal to expenses being incurred.

B. Lamus failed to disclose material liabilities Enchante had when he solicited and sold the investment.

C. Lamus misrepresented the existence of sales of Enchante as a result of one or more consignment agreements.  These consignment agreement(s) were structured whereby Enchante would provide its inventory to be held in retail stores, but such were neither sales nor should have been counted as revenue when the product was delivered.

D. Lamus represented that Enchante, at the time of sale, had a valuation of one million two hundred fifty thousand dollars ($1,250,000.00) or more.

E. Lamus failed to disclose that the financial statements of Enchante did not comport with Generally Accepted Accounting Principles (GAAP).

F. Lamus failed to disclose problems in Enchante's sales and distribution structure.

G. Lamus failed to disclose that on or about October 17, 2016, Fernando Mateu and his wife requested rescission of their 2015 securities purchases.

H. Lamus failed to disclose that in response to the October 17, 2016 request for rescission by Mateu, Lamus disclosed the lack of liquidity and

insolvency of Enchante and sought to payback Mateu's investment with the use of new investors' funds.

66.     The foregoing statements were false and/or materially misleading. Enchante was incurring substantial losses when the sale of the securities occurred. Enchante had unpaid and substantial liabilities, including unpaid taxes in Colombia, unpaid accounts payable and royalties to Enchante's primary supplier, La Biothetique, and amounts claim by Lamus himself for back due salaries and expenses.  The consignment arrangements resulted in inflated revenue because sales were recognized when product was shipped, but retail stores had no obligation to pay for the products prior to their sale to the end-user or customer. The business valuation was grossly inflated and did not rely upon any recognized valuation methodology or reasonable valuation assumptions.  Lamus knew, at the time of the sale of the securities, that the company had engaged in questionable sales practices.  These questionable sales practices involved the sale of goods on credit to retailers which were either a poor credit risk or known to be uncollectible.

67.     In soliciting the investment to Fernau, Lamus provided, in a March 1, 2017 email communication, that:

A. Enchante had a one million two hundred fifty thousand dollar ($1,250,000.00) valuation.

B.  At least fifty percent (50%) of the initial investment by Fernau would remain in the company.

68.     The foregoing statements were false and materially misleading when made.  This valuation was grossly inflated and did not rely upon any recognized valuation methodology or reasonable assumptions.  Fifty percent (50%) of the initial investment did not remain within the company, but was quickly spent, including for payment of such items as Lamus' claims for past due personal salary and expenses.

69.     In the sale of securities to Fernau, Lamus distributed, on March 3, 2017, a copy of the Investment Memo, Executive Summary, the same or similar as was presented to Mateu.  The disclosures contained in the document were materially false and misleading and/or the document contained forecasts and assumptions which lacked any reasonable basis in fact.  Such misrepresentations and omissions included:

A.  The business provides approximately thirty percent (~30%) operating profit and strong free cash flow of about twenty percent (~20%).

B.  Over eight hundred sixty thousand dollars ($860,000.00) was invested on or before August of 2015 into Enchante.

C.  That investors should expect full payback or return of their capital within fifty (50) months, including dividend payouts of two million dollars ($2,000,000.00) per year by 2019.

D.  The business would reach a valuation of thirty-eight to fifty-two million dollars ($38,000,000.00 - $52,000,000.00).

E.  That sales should be expected per salon conservatively of two thousand dollars ($2,000.00) per month, with the better producing salons to exceed ten thousand dollars per month ($10,000.00).

F.  That the company could be expected to deliver over one hundred million dollars ($100,000,000.00) in revenue within ten (10) years.

G.  Because of a lean organizational structure, positive cash flow would be expected within six (6) months.

H.  That the "project has attractive investment considerations that provide significant upside potential at minimum risk."

I.  The company yields large cash flows, very high returns, and has great scalability.

J.  Fundraising would be mostly allocated to working capital, hiring personnel, and marketing; thus "limiting any risk."

K. Revenue forecasts were made of ten million ($10,000,000.00) and thirty million dollars ($30,000.000.00) in years three (3) and four (4), respectively.

L.  Operating profit forecasts were made of two million ($2,000,000.00) and seven million dollars ($7,000,000.00) in years three (3) and four (4), respectively.

M. Three hundred thousand dollars ($300,000.00) was already committed in the current round of capital raising.

N.  An expected return of five times (5x) could be achieved within five (5) years.

O.  The use of funds would include six hundred thousand dollars ($600,000.00) into the development of a Florida flagship store and two hundred thousand dollars ($200,000.00) into new product.

70.     By March of 2017, Enchante was already on the verge of collapse. Not only were the foregoing statements false and materially misleading when made, but by 2017, it was known that such statements had no reasonable basis in fact.  Enchante had never reached a point of profitability for which dividends could be paid.  Per store sales were dismissal and nowhere near the two thousand ($2,000.00) to ten thousand dollar ($10,000.00) per month estimates.  The use of proceeds did not follow the representations made and instead, Lamus received

substantial payments from Enchante for his personal salary, lavish travel, and meals and entertainment.

71.    On March 6, 2017, Lamus, in soliciting the investment to Fernau, made additional statements which were false and/or Lamus was reckless when making such statements.  Such false statements and/or misstatements included:

A. Based on an initial investment of one hundred twenty-five thousand dollars ($125,000.00), Mr. Fernau could expect a forty-five to seventy percent (45-70%) cumulative annual growth rate and return of two hundred fifty-six thousand ($256,000.00) to four hundred ninety-three thousand dollars ($493,000.00) in three (3) years.

B. Mr. Fernau, in addition to the growth rate of the investment, could expect ten percent (10%) annual returns by dividends.

C. In a "base case scenario," Enchante would have a valuation of over two million nine hundred thousand dollars ($2,900,000.00) and, in a "best case scenario," that valuation would rise to almost four million dollars ($4,000,000.00) in three (3) years.

72.    By 2017, Enchante had nominal value because of its mounting liabilities.  Lamus was personally aware of the impossibility of reaching his prior sales and growth forecasts, yet continued to make such unsupportable representations to Fernau.

73.     Had Lamus made full and accurate disclosure at the time of the sale of the securities, Fernau would not have invested into the company.  Fernau's reliance was also reasonable.  Lamus was the chief executive officer and a director and therefore had access to the books and records of Enchante.

74.     The untrue statements and omissions of material fact were the proximate cause of Fernau's loss.  Due to the poor financial state of the company, Enchante failed less than one year after Fernau's investment.  At the time of Fernau's investment, Enchante was already on the verge of collapse due to its failure to develop revenue channels and substantial, unpaid liabilities.

75.     On January 26, 2018, Fernau, through his attorney, sent a notice of rescission to Lamus and Enchante, requesting the return of the sixty-two thousand five hundred dollars ($62,500) invested.

76.     Lamus and Enchante have failed to tender Fernau's funds.

77.     Pursuant to Fla. Stat §517.211(6), Fernau requests an award of reasonable attorneys' fees.

## COUNT III
## RESCISSION UNDER §29(b) OF THE SECURITIES EXCHANGE ACT OF 1934
## (15 U.S.C. §78CC)
(Fernau vs. Lamus and Enchante)

78.     The allegations contained in paragraphs 1 through 34 are hereby incorporated by reference as if such were restated in full.

79.     Pursuant to §29(b) of the Exchange Act, every contract made in violation of, or the performance of a contract which involves the violation of, any provision of 15 U.S.C. §§78a, *et seq*. is void with regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract.

80.     The investment contract with Fernau was entered into and made in violation of §10(b) of the Exchange Act, 15 U.S.C. §78j, and promulgated rule 10b-5 thereunder, 17 C.F.R. §240.10b-5.

81.     §10(b) of the Exchange Act provides that it shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange to use or employ, in connection with the purchase or sale of any security any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe.

82.     Lamus and Enchante violated §10(b) of the Exchange Act and promulgated Rule 10b-5 thereunder and have used the means and instrumentality of interstate commerce, including the mails, in the consummation of their fraud. The following are some of the wire communications made by Lamus in connection with the sale of the securities to Fernau:

A. Email communication on February 28, 2017, from Lamus to Fernau, containing a pro forma income statement for 2017.  A copy of the communication is attached as Exhibit "E."

B. Email communication on March 1, 2017, from Lamus to Fernau, which is attached as Exhibit "C."

C. Email communication on March 3, 2017, distributing an Investment Memo Executive Summary.  A copy of the Investment Memo is attached as Exhibit "A."

D. Email communication on March 6, 2017, from Lamus to Fernau.  A copy of the communication is attached as Exhibit "D."

83.    Between February and March of 2017, Lamus solicited Fernau for the investment of sixty-two thousand five hundred dollars ($62,500.00) into Enchante.

84.    Much the same as Mateu, the Fernau investment was solicited and sold with material misstatements and omissions of material fact.  Lamus was aware of the poor and deteriorating financial performance of Enchante and substantial, unpaid liabilities, but failed to disclose this information at the time of the sale of the securities.

85.    Although the subscription agreement states that Fernau had been provided with "access to all information, including financial statements and other financial information of the Company, and has been afforded an opportunity to ask

questions of and receive answers from the Company," the information he had received from Lamus, on behalf of Enchante, was false and materially misleading. These misrepresentations and omissions included:

A. Lamus represented that Enchante was at a break-even point financially whereby revenues were approximately equal to expenses being incurred.

B. Lamus failed to disclose material liabilities Enchante had when he solicited and sold the investment.

C. Lamus misrepresented the existence of sales of Enchante as a result of one or more consignment agreements.  These consignment agreement(s) were structured whereby Enchante would provide its inventory to be held in retail stores, but such were neither sales nor should have been counted as revenue when the product was delivered.

D. Lamus represented that Enchante, at the time of sale, had a valuation of one million two hundred fifty thousand dollars ($1,250,000.00) or more.

E. Lamus failed to disclose that the financial statements of Enchante did not comport with Generally Accepted Accounting Principles (GAAP).

F. Lamus failed to disclose problems in Enchante's sales and distribution structure.

G. Lamus failed to disclose that on or about October 17, 2016, Fernando

Mateu and his wife requested rescission of their 2015 securities purchases.

H. Lamus failed to disclose that in response to the October 17, 2016

request for rescission by Mateu, Lamus disclosed the lack of liquidity and

insolvency of Enchante and sought to payback Mateu's investment with the

use of new investors' funds.

86.     The foregoing statements were false and/or materially misleading.

Enchante was incurring substantial losses when the sale of the securities occurred.

Enchante had unpaid and substantial liabilities, including unpaid taxes in

Colombia, unpaid accounts payable and royalties to Enchante's primary supplier,

La Biothetique, and amounts claim by Lamus himself for back due salaries and

expenses.  The consignment arrangements resulted in inflated revenue because

sales were recognized when product was shipped, but retail stores had no

obligation to pay for the products prior to their sale to the end-user or customer.

The business valuation was grossly inflated and did not rely upon any recognized

valuation methodology or reasonable valuation assumptions.  Lamus knew, at the

time of the sale of the securities, that the company had engaged in questionable

sales practices.  These questionable sales practices involved the sale of goods on

credit to retailers which were either a poor credit risk or known to be uncollectible.

87.     In soliciting the investment to Fernau, Lamus provided, in a March 1, 2017 email communication, that:

A. Enchante had a one million two hundred fifty thousand dollar ($1,250,000.00) valuation.

B. At least fifty percent (50%) of the initial investment by Fernau would remain in the company.

88.     The foregoing statements were false and materially misleading when made.  This valuation was grossly inflated and did not rely upon any recognized valuation methodology or reasonable assumptions.  Fifty percent (50%) of the initial investment did not remain within the company, but was quickly spent, including for payment of such items as Lamus' claims for past due personal salary and expenses.

89.     In the sale of securities to Fernau, Lamus distributed, on March 3, 2017, a copy of the Investment Memo, Executive Summary, the same or similar as was presented to Mateu.  The disclosures contained in the document were materially false and misleading and/or the document contained forecasts and assumptions which lacked any reasonable basis in fact.  Such misrepresentations and omissions included:

A. The business provides approximately thirty percent (~30%) operating profit and strong free cash flow of about twenty percent (~20%).

B.  Over eight hundred sixty thousand dollars ($860,000.00) was invested on or before August of 2015 into Enchante.

C.  That investors should expect full payback or return of their capital within fifty (50) months, including dividend payouts of two million dollars ($2,000,000.00) per year by 2019.

D.  The business would reach a valuation of thirty-eight to fifty-two million dollars ($38,000,000.00 - $52,000,000.00).

E.  That sales should be expected per salon conservatively of two thousand dollars ($2,000.00) per month, with the better producing salons to exceed ten thousand dollars per month ($10,000.00).

F.  That the company could be expected to deliver over one hundred million dollars ($100,000,000.00) in revenue within ten (10) years.

G.  Because of a lean organizational structure, positive cash flow would be expected within six (6) months.

H.  That the "project has attractive investment considerations that provide significant upside potential at minimum risk."

I.  The company yields large cash flows, very high returns, and has great scalability.

J.  Fundraising would be mostly allocated to working capital, hiring personnel, and marketing; thus "limiting any risk."

K. Revenue forecasts were made of ten million ($10,000,000.00) and thirty million dollars ($30,000.000.00) in years three (3) and four (4), respectively.

L. Operating profit forecasts were made of two million ($2,000,000.00) and seven million dollars ($7,000,000.00) in years three (3) and four (4), respectively.

M. Three hundred thousand dollars ($300,000.00) was already committed in the current round of capital raising.

N. An expected return of five times (5x) could be achieved within five (5) years.

O. The use of funds would include six hundred thousand dollars ($600,000.00) into the development of a Florida flagship store and two hundred thousand dollars ($200,000.00) into new product.

90.    By March of 2017, Enchante was already on the verge of collapse. Not only were the foregoing statements false and materially misleading when made, but by 2017, it was known that such statements had no reasonable basis in fact.  Enchante had never reached a point of profitability for which dividends could be paid.  Per store sales were dismissal and nowhere near the two thousand ($2,000.00) to ten thousand dollar ($10,000.00) per month estimates.  The use of proceeds did not follow the representations made and instead, Lamus received

substantial payments from Enchante for his personal salary, lavish travel, and meals and entertainment.

91.     On March 6, 2017, Lamus, in soliciting the investment to Fernau, made additional statements which were false and/or Lamus was reckless when making such statements.  Such false statements and/or misstatements included:

A. Based on an initial investment of one hundred twenty-five thousand dollars ($125,000.00), Mr. Fernau could expect a forty-five to seventy percent (45-70%) cumulative annual growth rate and return of two hundred fifty-six thousand ($256,000.00) to four hundred ninety-three thousand dollars ($493,000.00) in three (3) years.

B. Mr. Fernau, in addition to the growth rate of the investment, could expect ten percent (10%) annual returns by dividends.

C. In a "base case scenario," Enchante would have a valuation of over two million nine hundred thousand dollars ($2,900,000.00) and, in a "best case scenario," that valuation would rise to almost four million dollars ($4,000,000.00) in three (3) years.

92.     By 2017, Enchante had nominal value because of its mounting liabilities.  Lamus was personally aware of the impossibility of reaching his prior sales and growth forecasts, yet continued to make such unsupportable representations to Fernau.

93.     Lamus' untrue statements of material fact and omissions to disclose material facts in connection with the sale of the securities to Fernau constitute devices, schemes, and artifices to defraud and constitute acts, practices, or courses of conduct which operated as fraud or deceit within the meaning of §10(b) of the Exchange Act and promulgated Rule 10b-5 thereunder.

94.     Had Lamus made full and accurate disclosure at the time of the sale of the securities, Fernau would not have invested into the company.  Fernau's reliance was also reasonable.  Lamus was the chief executive officer and a director and therefore had access to the books and records of Enchante.

95.     The untrue statements and omissions of material fact were the proximate cause of Fernau's loss.  Due to the poor financial state of the company, Enchante failed less than one year after Fernau's investment.  At the time of Fernau's investment, Enchante was already on the verge of collapse due to its failure to develop revenue channels and substantial, unpaid liabilities.

96.     Lamus and Enchante acted with scienter in the consummation of their fraudulent scheme.  The omissions and misrepresentations were not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care and misled Fernau.  Lamus was personally aware of the poor financial condition of Enchante as he was the chief executive officer and director and was primarily responsible for the creation and maintenance of the books and

records of the company.  Further, Fernau's funds were immediately used to pay

such expenses as Lamus' own personal compensation.

97.    On January 26, 2018, Fernau, through his attorney, sent a notice of

rescission to Defendants, requesting the return of the sixty-two thousand five

hundred dollars ($62,500) invested.

98.    Lamus and Enchante have failed to tender Fernau's funds.

**COUNT IV**
**FRAUD IN CONNECTION WITH THE SALE OF A SECURITY**
**(Fla. Stat. §517.301)**
(Mateu vs. All Defendants)

99.    The allegations contained in paragraphs 1 through 34 are hereby

incorporated by reference as if such were restated in full.

100.    Fla. Stat. §517.301 provides that it is unlawful and a violation of

Chapter 517 of the Florida Code for a person, in connection with the offer, sale, or

purchase of any investment or security (i) to employ any device, scheme, or artifice

to defraud, (ii) to obtain money or property by means of any untrue statement of a

material fact or any omission to state a material fact necessary in order to make the

statements made, in the light of the circumstances under which they were made,

not misleading, or (iii) to engage in any transaction, practice, or course of business

which operates or would operate as a fraud or deceit upon a person.

101.    Lamus, Rey, and Enchante, by and through Lamus as chief executive

officer and a director and Rey as sales agent of securities, violated §517.301

because they, in connection with the sale of a security, (i) employed a device, scheme, or artifice to defraud, (ii) obtained money or property by means of untrue statements of material fact and omissions to state material facts, and (iii) engaged in a transaction, practice, or course of business which operated as a fraud or deceit upon Mateu.

102.   In August of 2015, Lamus and Rey solicited Mateu for the investment of one hundred thousand dollars ($100,000.00) into Enchante.  The investment was solicited with material misstatements and omissions in violation of both state and federal securities laws.

103.   The misrepresentations and omissions occurred on or about August 5, 2015.  Rey first presented the success of Enchante and its cosmetics business to Mateu.  Lamus subsequently organized two in-person meetings in Miami for the purpose of solicitation and sale of the investment to Mateu.

104.   In soliciting the investment to Mateu, Lamus and Rey relied upon the means and instrumentality of interstate commerce, including wire communications. Communications were made by telephone and electronic instant messaging, in and around August of 2015, to promote Enchante and the sale of the investment to Mateu.

105.   Although the subscription agreement states that Mateu had been provided with "an opportunity to discuss with management of the Company and to

ask questions about the Company's current and prospective financial condition, assets and liabilities, business operations, sales, sales prospects, strategic initiatives and business plans," the information provided by Lamus and Rey was materially false and misleading and they omitted to disclose all material information in connection with the sale of the securities.  Such misrepresentations and omissions included:

A. Enchante was an established, operating business generating substantial cash flows.

B. The company was approximately breaking even financially with revenues meeting expenses.

C. A six to eight percent (6 – 8%) dividend would be expected for 2016.

D. The company reached a valuation of between one million two hundred fifty thousand dollars ($1,250,000.00) and two million three hundred thousand dollars ($2,300,000.00).

E. The use of proceeds of Mateu's investment would primarily be used to fund Enchante's operations and not paid out to Lamus personally.

F. Enchante already had substantially more investment committed by other parties.

106.  The foregoing statements were false.  Enchante was a startup business.  Cash flows were negative and the survival of the company relied upon

use of new investors' funds.  Enchante was experiencing heavy financial losses.
No dividend could or would be declared.  This business valuation was grossly
inflated and did not rely upon any recognized valuation methodology.  Lamus and
Rey intended to use Mateu's investment funds for their personal benefit.

107.   In connection with the sale of the securities to Mateu, Defendants
relied upon a document entitled Investment Memo, Executive Summary or a
document similar thereto.  The disclosures contained in the document were
materially false and misleading and/or the document contained forecasts and
assumptions which lacked any reasonable basis in fact.  Such misrepresentations
and omissions included:

A. The business provided approximately thirty percent (~30%) operating
profit and strong free cash flow of about twenty percent (~20%).

B. Over eight hundred sixty thousand dollars ($860,000.00) was invested
on or before August of 2015 into Enchante.

C. Investors should expect full payback or return of their capital within
fifty (50) months, including dividend payouts of two million dollars
($2,000,000.00) per year by 2019.

D. The business would reasonably reach a valuation of thirty-eight to
fifty-two million dollars ($38,000,000.00 - 52,000,000.00).

E.  That sales should be expected per salon conservatively of two thousand dollars ($2,000.00) per month, with the better producing salons to exceed ten thousand dollars ($10,000.00) per month.

F.  That the company could be expected to deliver over one hundred million dollars ($100,000,000.00) in revenue within ten (10) years.

G.  Because of a lean organizational structure, positive cash flow would be expected within six (6) months.

H.  That the "project has attractive investment considerations that provide significant upside potential at minimum risk."

I.  The company yields large cash flows, very high returns, and has great scalability.

J.  Fundraising will be mostly allocated to working capital, hiring personnel, and marketing; thus "limiting any risk."

K.  Revenue forecasts were made of ten million ($10,000,000.00) and thirty million dollars ($30,000,000.00) in years three (3) and four (4), respectively.

L.  Operating profit forecasts were made of two million ($2,000,000.00) and seven million dollars ($7,000,000.00) in years three (3) and four (4), respectively.

M. Three hundred thousand dollars ($300,000.00) was already committed in the current round of capital raising.

N. An expected return of five times (5x) could be achieved within five (5) years.

O. The use of funds would include six hundred thousand dollars ($600,000.00) into the development of a Florida flagship store and two hundred thousand dollars ($200,000.00) into new product.

108.   Upon information and belief, the foregoing representations were false and/or materially misleading.  Enchante had never reached a point of profitability. It was therefore unreasonable to expect any substantial returns or dividends in the foreseeable future, much less support the multi-million dollar valuations Lamus presented.  The use of proceeds was not accurately described.  Instead, investor funds were distributed to pay for such items as Lamus' personal salary, lavish travel expense, and personal meals and entertainment.  The eight hundred sixty thousand dollars ($860,000.00) of purported invested capital, as of August 2015, was not true.  Sales per salon had not "conservatively" reached two thousand dollars ($2,000.00) per month nor the ten thousand dollars ($10,000.00) per month represented.  The purported Florida flag ship store was never created nor was two hundred thousand dollars ($200,000.00) invested into new product.

109.   In connection with the sale of the securities to Mateu, Defendants relied upon a document entitled Strategic Channels NWA Presentation or a document similar thereto.  The disclosures contained in the document were materially false and misleading and/or the document contained forecasts and assumptions which lacked any reasonable basis in fact.  Such misrepresentations and omissions included:

A.  Sales were expected to reach three million dollars ($3,000.000.00) in 2017 and twenty-six million dollars ($26,000,000.00) in 2019.

B.  After tax profit was expected to reach six hundred thousand dollars ($600,000.00) in 2017 and six million seven hundred thousand dollars ($6,700,000.00) in 2019.

C.  Cash flows were expected to reach four hundred thousand dollars ($400,000.00) in 2017 and five million seven hundred thousand dollars ($5,700,000.00) in 2019.

D.  Dividends were expected to be paid in the amounts of four hundred thousand dollars ($400,000.00) in 2017 and three million seven hundred thousand dollars ($3,700,000.00) in 2019.

E.  The results identified in subparagraphs A through D could be achieved with only one million four hundred thousand dollars ($1,400,000.00) of invested capital.

F.  Valuations could be supported with a thirty-eight percent (38%) discounted cash flow rate.

G.  The company carried a two million three hundred thousand ($2,300,000.00) pre-money valuation in 2015.

H.  Investors could expect a five times (5x) return in only five (5) years.

I.  That the use of proceeds would include five hundred thousand dollars ($500,000.00) into product inventory and store development in Florida, New York, Massachusetts, and Louisiana, one hundred fifty thousand dollars ($150,000.00) into a Florida flagship academy, one hundred fifty thousand dollars ($150,000.00) into a Colombia and second flagship store, and two hundred thousand dollars ($200,000.00) into development of distribution channels through luxury department stores.

J.  The company could become a one hundred-million-dollar ($100,000,000.00) distribution business in the Americas within five (5) years.

K.  Thirty percent (30%) operating profit could be expected.

110.    Upon information and belief, the foregoing representations were materially false and misleading when made.  The revenue and profitability forecasts, as well as the corresponding company valuations, did not rely upon any recognized methodology or reasonable assumptions.  Enchante had never reached a

point of profitability. It was therefore unreasonable to expect payment of dividends to investors in the foreseeable future. The use of proceeds was not accurately described. Five hundred thousand dollars ($500,000.00) was not invested into product inventory nor was an additional one hundred fifty thousand dollars ($150,000.00) invested for the creation of any flagship store in either the United States or abroad. Two hundred thousand dollars ($200,000.00) was not invested into the development of distribution channels through luxury department stores.

111.    Lamus and Rey were aware of the poor financial performance of Enchante at the time of sale, or were severely reckless in not knowing, but failed to disclose the particular risk factors to Mateu as well as those negative events that had already materialized by August of 2015.

112.    In December of 2015, Lamus and Rey solicited Mateu for an additional investment of six thousand dollars ($6,000) into Enchante.

113.    The investment was also solicited with material misstatements and omissions. Both Lamus and Rey were aware, or were severely reckless in not knowing, of the poor and deteriorating financial condition of Enchante in December of 2015, but failed to disclose that information at the time of the sale of the securities to Mateu.

114.    Among such misrepresentations and omissions, Lamus and Rey were aware of the substantial losses being incurred by Enchante in 2015.  They further failed to correct their misrepresentations and omissions made in August of 2015 regarding the success of Enchante.

115.    Had Lamus and Rey made full and accurate disclosure at the time of the sale of the securities, Mateu would not have invested into the company. Mateu's reliance was also reasonable.  Lamus was the chief executive officer and a director and therefore had access to the books and records of Enchante.  Rey is Lamus' wife and functioned as a sales agent and promotor of her husband's company.

116.    The untrue statements and omissions of material fact were the proximate cause of Mateu's loss.  Due to the poor financial state of the company, Enchante failed within two (2) years of Mateu's investment.

117.    This cause of action is brought within the statute of limitations period set forth under Fla. Stat. §95.11(4)(e) because it was filed within two (2) years of the time that the facts giving rise to the cause of action were discovered, or should have been discovered with the exercise of due diligence, and within five (5) years of the date of violation.  Mateu discovered the facts surrounding Defendants' misrepresentations and omissions on or after October of 2016.

**COUNT V**
**FRAUD IN CONNECTION WITH THE SALE OF A SECURITY**
**(Fla. Stat. §517.301)**
(Fernau vs. Lamus and Enchante)

118.   The allegations contained in paragraphs 1 through 34 are hereby incorporated by reference as if such were restated in full.

119.   Fla. Stat. §517.301 provides that it is unlawful and a violation of Chapter 517 of the Florida Code for a person, in connection with the offer, sale, or purchase of any investment or security (i) to employ any device, scheme, or artifice to defraud, (ii) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (iii) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a person.

120.   Lamus and Enchante, by and through Lamus as chief executive officer and a director, violated §517.301 because they, in connection with the sale of a security, (i) employed a device, scheme, or artifice to defraud, (ii) obtained money or property by means of untrue statements of material fact and omissions to state material facts, and (iii) engaged in a transaction, practice, or course of business which operated as a fraud or deceit upon Fernau.

121.   Between February and March of 2017, Lamus solicited Fernau for the investment of sixty-two thousand five hundred dollars ($62,500.00) into Enchante.

122.   Much the same as Mateu, the Fernau investment was solicited and sold with material misstatements and omissions of material fact.  Lamus was aware of the poor and deteriorating financial performance of Enchante and substantial, unpaid liabilities, but failed to disclose this information at the time of the sale of the securities.

123.   Although the subscription agreement states that Fernau had been provided with "access to all information, including financial statements and other financial information of the Company, and has been afforded an opportunity to ask questions of and receive answers from the Company," the information he had received from Lamus, on behalf of Enchante, was false and materially misleading. These misrepresentations and omissions included:

A. Lamus represented that Enchante was at a break-even point financially whereby revenues were approximately equal to expenses being incurred.

B. Lamus failed to disclose material liabilities Enchante had when he solicited and sold the investment.

C. Lamus misrepresented the existence of sales of Enchante as a result of one or more consignment agreements.  These consignment agreement(s) were structured whereby Enchante would provide its inventory to be held in

retail stores, but such were neither sales nor should have been counted as revenue when the product was delivered.

D. Lamus represented that Enchante, at the time of sale, had a valuation of one million two hundred fifty thousand dollars ($1,250,000.00) or more.

E. Lamus failed to disclose that the financial statements of Enchante did not comport with Generally Accepted Accounting Principles (GAAP).

F. Lamus failed to disclose problems in Enchante's sales and distribution structure.

G. Lamus failed to disclose that on or about October 17, 2016, Fernando Mateu and his wife requested rescission of their 2015 securities purchases.

H. Lamus failed to disclose that in response to the October 17, 2016 request for rescission by Mateu, Lamus disclosed the lack of liquidity and insolvency of Enchante and sought to payback Mateu's investment with the use of new investors' funds.

124.   The foregoing statements were false and/or materially misleading. Enchante was incurring substantial losses when the sale of the securities occurred. Enchante had unpaid and substantial liabilities, including unpaid taxes in Colombia, unpaid accounts payable and royalties to Enchante's primary supplier, La Biothetique, and amounts claim by Lamus himself for back due salaries and expenses.  The consignment arrangements resulted in inflated revenue because

sales were recognized when product was shipped, but retail stores had no obligation to pay for the products prior to their sale to the end-user or customer. The business valuation was grossly inflated and did not rely upon any recognized valuation methodology or reasonable valuation assumptions.  Lamus knew, at the time of the sale of the securities, that the company had engaged in questionable sales practices.  These questionable sales practices involved the sale of goods on credit to retailers which were either a poor credit risk or known to be uncollectible.

125.   In soliciting the investment to Fernau, Lamus provided, in a March 1, 2017 email communication, that:

A. Enchante had a one million two hundred fifty thousand dollar ($1,250,000.00) valuation.

B. At least fifty percent (50%) of the initial investment by Fernau would remain in the company.

126.   The foregoing statements were false and materially misleading when made.  This valuation was grossly inflated and did not rely upon any recognized valuation methodology or reasonable assumptions.  Fifty percent (50%) of the initial investment did not remain within the company, but was quickly spent, including for payment of such items as Lamus' claims for past due personal salary and expenses.

127.   In the sale of securities to Fernau, Lamus distributed, on March 3, 2017, a copy of the Investment Memo, Executive Summary, the same or similar as was presented to Mateu.  The disclosures contained in the document were materially false and misleading and/or the document contained forecasts and assumptions which lacked any reasonable basis in fact.  Such misrepresentations and omissions included:

A. The business provides approximately thirty percent (~30%) operating profit and strong free cash flow of about twenty percent (~20%).

B. Over eight hundred sixty thousand dollars ($860,000.00) was invested on or before August of 2015 into Enchante.

C. That investors should expect full payback or return of their capital within fifty (50) months, including dividend payouts of two million dollars ($2,000,000.00) per year by 2019.

D. The business would reach a valuation of thirty-eight to fifty-two million dollars ($38,000,000.00 - $52,000,000.00).

E. That sales should be expected per salon conservatively of two thousand dollars ($2,000.00) per month, with the better producing salons to exceed ten thousand dollars per month ($10,000.00).

F. That the company could be expected to deliver over one hundred million dollars ($100,000,000.00) in revenue within ten (10) years.

G. Because of a lean organizational structure, positive cash flow would be expected within six (6) months.

H. That the "project has attractive investment considerations that provide significant upside potential at minimum risk."

I. The company yields large cash flows, very high returns, and has great scalability.

J. Fundraising would be mostly allocated to working capital, hiring personnel, and marketing; thus "limiting any risk."

K. Revenue forecasts were made of ten million ($10,000,000.00) and thirty million dollars ($30,000.000.00) in years three (3) and four (4), respectively.

L. Operating profit forecasts were made of two million ($2,000,000.00) and seven million dollars ($7,000,000.00) in years three (3) and four (4), respectively.

M. Three hundred thousand dollars ($300,000.00) was already committed in the current round of capital raising.

N. An expected return of five times (5x) could be achieved within five (5) years.

O. The use of funds would include six hundred thousand dollars ($600,000.00) into the development of a Florida flagship store and two hundred thousand dollars ($200,000.00) into new product.

128.   By March of 2017, Enchante was already on the verge of collapse. Not only were the foregoing statements false and materially misleading when made, but by 2017, it was known that such statements had no reasonable basis in fact.  Enchante had never reached a point of profitability for which dividends could be paid.  Per store sales were dismissal and nowhere near the two thousand ($2,000.00) to ten thousand dollar ($10,000.00) per month estimates.  The use of proceeds did not follow the representations made and instead, Lamus received substantial payments from Enchante for his personal salary, lavish travel, and meals and entertainment.

129.   On March 6, 2017, Lamus, in soliciting the investment to Fernau, made additional statements which were false and/or Lamus was reckless when making such statements.  Such false statements and/or misstatements included:

A. Based on an initial investment of one hundred twenty-five thousand dollars ($125,000.00), Mr. Fernau could expect a forty-five to seventy percent (45-70%) cumulative annual growth rate and return of two hundred fifty-six thousand ($256,000.00) to four hundred ninety-three thousand dollars ($493,000.00) in three (3) years.

B. Mr. Fernau, in addition to the growth rate of the investment, could expect ten percent (10%) annual returns by dividends.

C. In a "base case scenario," Enchante would have a valuation of over two million nine hundred thousand dollars ($2,900,000.00) and, in a "best case scenario," that valuation would rise to almost four million dollars ($4,000,000.00) in three (3) years.

130.   By 2017, Enchante had nominal value because of its mounting liabilities.  Lamus was personally aware of the impossibility of reaching his prior sales and growth forecasts, yet continued to make such unsupportable representations to Fernau.

131.   Had Lamus made full and accurate disclosure at the time of the sale of the securities, Fernau would not have invested into the company.  Fernau's reliance was also reasonable.  Lamus was the chief executive officer and a director and therefore had access to the books and records of Enchante.

132.   The untrue statements and omissions of material fact were the proximate cause of Fernau's loss.  Due to the poor financial state of the company, Enchante failed less than one year after Fernau's investment.  At the time of Fernau's investment, Enchante was already on the verge of collapse due to its failure to develop revenue channels and substantial, unpaid liabilities.

## COUNT VI
## FRAUD IN CONNECTION WITH THE SALE OF A SECURITY
### (§10(b) of the Exchange Act, 15 U.S.C. §78j, and Rule 10b-5, 17 C.F.R. §240.10b-5)
(Mateu v. All Defendants)

133.   The allegations contained in paragraphs 1 through 34 are hereby incorporated by reference as if such were restated in full.

134.   The investment contracts with Mateu were entered into and made in violation of §10(b) of the Exchange Act, 15 U.S.C. §78j, and promulgated Rule 10b-5 thereunder, 17 C.F.R. §240.10b-5.

135.   §10(b) of the Exchange Act provides that it shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange to use or employ, in connection with the purchase or sale of any security any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe.

136.   Lamus, Rey, and Enchante violated §10(b) of the Exchange Act and promulgated Rule 10b-5 thereunder and have used the means and instrumentality of interstate commerce, including the mails, in the consummation of their fraud.

137.   In soliciting the investment to Mateu, Lamus and Rey further relied upon the use of the means and instrumentality of interstate commerce, including wire communications.  Communications were made by telephone and electronic

instant messaging, in and around August of 2015, to promote Enchante and the sale of the investment to Mateu.

138.   In August of 2015, Lamus and Rey solicited Mateu for the investment of one hundred thousand dollars ($100,000.00) into Enchante.  The investment was solicited with material misstatements and omissions in violation of both state and federal securities laws.

139.   The misrepresentations and omissions occurred on or about August 5, 2015.  Rey first presented the success of Enchante and its cosmetics business to Mateu.  Lamus subsequently organized two in-person meetings in Miami for the purpose of solicitation and sale of the investment to Mateu.

140.   In soliciting the investment to Mateu, Lamus and Rey relied upon the means and instrumentality of interstate commerce, including wire communications. Communications were made by telephone and electronic instant messaging, in and around August of 2015, to promote Enchante and the sale of the investment to Mateu.

141.   Although the subscription agreement states that Mateu had been provided with "an opportunity to discuss with management of the Company and to ask questions about the Company's current and prospective financial condition, assets and liabilities, business operations, sales, sales prospects, strategic initiatives and business plans," the information provided by Lamus and Rey was materially

false and misleading and they omitted to disclose all material information in connection with the sale of the securities.  Such misrepresentations and omissions included:

A.  Enchante was an established, operating business generating substantial cash flows.

B.  The company was approximately breaking even financially with revenues meeting expenses.

C.  A six to eight percent (6 – 8%) dividend would be expected for 2016.

D.  The company reached a valuation of between one million two hundred fifty thousand dollars ($1,250,000.00) and two million three hundred thousand dollars ($2,300,000.00).

E.  The use of proceeds of Mateu's investment would primarily be used to fund Enchante's operations and not paid out to Lamus personally.

F.  Enchante already had substantially more investment committed by other parties.

142.   The foregoing statements were false.  Enchante was a startup business.  Cash flows were negative and the survival of the company relied upon use of new investors' funds.  Enchante was experiencing heavy financial losses. No dividend could or would be declared.  This business valuation was grossly

inflated and did not rely upon any recognized valuation methodology.  Lamus and Rey intended to use Mateu's investment funds for their personal benefit.

143.   In connection with the sale of the securities to Mateu, Defendants relied upon a document entitled Investment Memo, Executive Summary or a document similar thereto.  The disclosures contained in the document were materially false and misleading and/or the document contained forecasts and assumptions which lacked any reasonable basis in fact.  Such misrepresentations and omissions included:

A.  The business provided approximately thirty percent (~30%) operating profit and strong free cash flow of about twenty percent (~20%).

B.  Over eight hundred sixty thousand dollars ($860,000.00) was invested on or before August of 2015 into Enchante.

C.  Investors should expect full payback or return of their capital within fifty (50) months, including dividend payouts of two million dollars ($2,000,000.00) per year by 2019.

D.  The business would reasonably reach a valuation of thirty-eight to fifty-two million dollars ($38,000,000.00 - 52,000,000.00).

E.  That sales should be expected per salon conservatively of two thousand dollars ($2,000.00) per month, with the better producing salons to exceed ten thousand dollars ($10,000.00) per month.

F.  That the company could be expected to deliver over one hundred million dollars ($100,000,000.00) in revenue within ten (10) years.

G. Because of a lean organizational structure, positive cash flow would be expected within six (6) months.

H. That the "project has attractive investment considerations that provide significant upside potential at minimum risk."

I.  The company yields large cash flows, very high returns, and has great scalability.

J.  Fundraising will be mostly allocated to working capital, hiring personnel, and marketing; thus "limiting any risk."

K. Revenue forecasts were made of ten million ($10,000,000.00) and thirty million dollars ($30,000,000.00) in years three (3) and four (4), respectively.

L.  Operating profit forecasts were made of two million ($2,000,000.00) and seven million dollars ($7,000,000.00) in years three (3) and four (4), respectively.

M. Three hundred thousand dollars ($300,000.00) was already committed in the current round of capital raising.

N. An expected return of five times (5x) could be achieved within five (5) years.

O. The use of funds would include six hundred thousand dollars ($600,000.00) into the development of a Florida flagship store and two hundred thousand dollars ($200,000.00) into new product.

144.   Upon information and belief, the foregoing representations were false and/or materially misleading.  Enchante had never reached a point of profitability. It was therefore unreasonable to expect any substantial returns or dividends in the foreseeable future, much less support the multi-million dollar valuations Lamus presented.  The use of proceeds was not accurately described.  Instead, investor funds were distributed to pay for such items as Lamus' personal salary, lavish travel expense, and personal meals and entertainment.  The eight hundred sixty thousand dollars ($860,000.00) of purported invested capital, as of August 2015, was not true.  Sales per salon had not "conservatively" reached two thousand dollars ($2,000.00) per month nor the ten thousand dollars ($10,000.00) per month represented.  The purported Florida flag ship store was never created nor was two hundred thousand dollars ($200,000.00) invested into new product.

145.   In connection with the sale of the securities to Mateu, Defendants relied upon a document entitled Strategic Channels NWA Presentation or a document similar thereto.  The disclosures contained in the document were materially false and misleading and/or the document contained forecasts and

assumptions which lacked any reasonable basis in fact.  Such misrepresentations

and omissions included:

A.  Sales were expected to reach three million dollars ($3,000.000.00) in

2017 and twenty-six million dollars ($26,000,000.00) in 2019.

B.  After tax profit was expected to reach six hundred thousand dollars

($600,000.00) in 2017 and six million seven hundred thousand dollars

($6,700,000.00) in 2019.

C.  Cash flows were expected to reach four hundred thousand dollars

($400,000.00) in 2017 and five million seven hundred thousand dollars

($5,700,000.00) in 2019.

D.  Dividends were expected to be paid in the amounts of four hundred

thousand dollars ($400,000.00) in 2017 and three million seven hundred

thousand dollars ($3,700,000.00) in 2019.

E.  The results identified in subparagraphs A through D could be

achieved with only one million four hundred thousand dollars

($1,400,000.00) of invested capital.

F.  Valuations could be supported with a thirty-eight percent (38%)

discounted cash flow rate.

G.  The company carried a two million three hundred thousand

($2,300,000.00) pre-money valuation in 2015.

H. Investors could expect a five times (5x) return in only five (5) years.

I.  That the use of proceeds would include five hundred thousand dollars ($500,000.00) into product inventory and store development in Florida, New York, Massachusetts, and Louisiana, one hundred fifty thousand dollars ($150,000.00) into a Florida flagship academy, one hundred fifty thousand dollars ($150,000.00) into a Colombia and second flagship store, and two hundred thousand dollars ($200,000.00) into development of distribution channels through luxury department stores.

J.  The company could become a one hundred-million-dollar ($100,000,000.00) distribution business in the Americas within five (5) years.

K. Thirty percent (30%) operating profit could be expected.

146.   Upon information and belief, the foregoing representations were materially false and misleading when made.  The revenue and profitability forecasts, as well as the corresponding company valuations, did not rely upon any recognized methodology or reasonable assumptions.  Enchante had never reached a point of profitability.  It was therefore unreasonable to expect payment of dividends to investors in the foreseeable future.  The use of proceeds was not accurately described.  Five hundred thousand dollars ($500,000.00) was not invested into product inventory nor was an additional one hundred fifty thousand

dollars ($150,000.00) invested for the creation of any flagship store in either the United States or abroad.  Two hundred thousand dollars ($200,000.00) was not invested into the development of distribution channels through luxury department stores.

147.   Lamus and Rey were aware of the poor financial performance of Enchante at the time of sale, or were severely reckless in not knowing, but failed to disclose the particular risk factors to Mateu as well as those negative events that had already materialized by August of 2015.

148.   In December of 2015, Lamus and Rey solicited Mateu for an additional investment of six thousand dollars ($6,000) into Enchante.

149.   The investment was also solicited with material misstatements and omissions.  Both Lamus and Rey were aware, or were severely reckless in not knowing, of the poor and deteriorating financial condition of Enchante in December of 2015, but failed to disclose that information at the time of the sale of the securities to Mateu.

150.   Among such misrepresentations and omissions, Lamus and Rey were aware of the substantial losses being incurred by Enchante in 2015.  They further failed to correct their misrepresentations and omissions made in August of 2015 regarding the success of Enchante.

151.   Had Lamus made full and accurate disclosure at the time of the sale of the securities, Mateu would not have invested into the company.  Mateu's reliance was also reasonable.  Lamus was the chief executive officer and a director and therefore had access to the books and records of Enchante.  Rey is Lamus' wife and functioned as a sales agent and promotor of her husband's company.

152.   The untrue statements and omissions of material fact were the proximate cause of Mateu's loss.  Due to the poor financial state of the company, Enchante failed within two (2) years of Mateu's investment.

153.   Defendants' untrue statements of material fact and omissions to disclose material facts in connection with the sale of the securities to Mateu constitute devices, schemes, and artifices to defraud and constitute acts, practices, or courses of conduct which operated as fraud or deceit within the meaning of §10(b) of the Exchange Act and promulgated Rule 10b-5 thereunder.

154.   Defendants acted with scienter in the consummation of their fraudulent scheme.  The omissions and misrepresentations were not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care and misled Mateu.  Lamus was personally aware of the poor financial condition of Enchante as he was the chief executive officer and director and was primarily responsible for the creation and maintenance of the books and records of the company.  Rey is Lamus' wife and functioned as a sales agent and

promotor of her husband's company.  Further, Mateu's funds were immediately

used to pay such expenses as Lamus' own personal compensation, lavish travel

expenses, and meals and entertainment.

155.   This cause of action is brought within the statute of limitations period

set forth under 28 U.S.C. §1658 because it was filed within two (2) years of

discovery of the facts constituting the violation or five (5) years after such

violation.  Mateu discovered the facts surrounding Defendants' misrepresentations

and omissions on or after October of 2016.

## COUNT VII
## FRAUD IN CONNECTION WITH THE SALE OF A SECURITY
### (§10(b) of the Exchange Act, 15 U.S.C. §78j, and Rule 10b-5, 17 C.F.R. §240.10b-5)
(Fernau vs. Lamus and Enchante)

156.   The allegations contained in paragraphs 1 through 34 are hereby

incorporated by reference as if such were restated in full.

157.   The investment contracts with Fernau were entered into and made in

violation of §10(b) of the Exchange Act, 15 U.S.C. §78j, and promulgated Rule

10b-5 thereunder, 17 C.F.R. §240.10b-5.

158.   §10(b) of the Exchange Act provides that it shall be unlawful for any

person, directly or indirectly, by the use of any means or instrumentality of

interstate commerce or of the mails, or of any facility of any national securities

exchange to use or employ, in connection with the purchase or sale of any security

any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe.

159.   Lamus and Enchante violated §10(b) of the Exchange Act and promulgated Rule 10b-5 thereunder and have used the means and instrumentality of interstate commerce, including the mails, in the consummation of their fraud. The following are some of the wire communications made by Lamus in connection sale of the securities to Fernau:

A. Email communication on February 28, 2017, from Lamus to Fernau, containing a pro forma income statement for 2017.  A copy of the communication is attached as Exhibit "E."

A. Email communication on March 1, 2017, from Lamus to Fernau, which is attached as Exhibit "C."

B. Email communication on March 3, 2017, distributing an Investment Memo Executive Summary.  A copy of the Investment Memo is attached as Exhibit "A."

C. Email communication on March 6, 2017, from Lamus to Fernau.  A copy of the communication is attached as Exhibit "D."

160.   Between February and March of 2017, Lamus solicited Fernau for the investment of sixty-two thousand five hundred dollars ($62,500.00) into Enchante.

161.   Much the same as Mateu, the Fernau investment was solicited and sold with material misstatements and omissions of material fact.  Lamus was aware of the poor and deteriorating financial performance of Enchante and substantial, unpaid liabilities, but failed to disclose this information at the time of the sale of the securities.

162.   Although the subscription agreement states that Fernau had been provided with "access to all information, including financial statements and other financial information of the Company, and has been afforded an opportunity to ask questions of and receive answers from the Company," the information he had received from Lamus, on behalf of Enchante, was false and materially misleading. These misrepresentations and omissions included:

A. Lamus represented that Enchante was at a break-even point financially whereby revenues were approximately equal to expenses being incurred.

B. Lamus failed to disclose material liabilities Enchante had when he solicited and sold the investment.

C. Lamus misrepresented the existence of sales of Enchante as a result of one or more consignment agreements.  These consignment agreement(s) were structured whereby Enchante would provide its inventory to be held in

retail stores, but such were neither sales nor should have been counted as revenue when the product was delivered.

D. Lamus represented that Enchante, at the time of sale, had a valuation of one million two hundred fifty thousand dollars ($1,250,000.00) or more.

E.  Lamus failed to disclose that the financial statements of Enchante did not comport with Generally Accepted Accounting Principles (GAAP).

F.  Lamus failed to disclose problems in Enchante's sales and distribution structure.

G.  Lamus failed to disclose that on or about October 17, 2016, Fernando Mateu and his wife requested rescission of their 2015 securities purchases.

H. Lamus failed to disclose that in response to the October 17, 2016 request for rescission by Mateu, Lamus disclosed the lack of liquidity and insolvency of Enchante, but sought to operate a ponzi scheme and thereby payback Mateu's investment with the use of new investors' funds.

163.   The foregoing statements were false and/or materially misleading. Enchante was incurring substantial losses when the sale of the securities occurred. Enchante had unpaid and substantial liabilities, including unpaid taxes in Colombia and unpaid accounts payable and royalties to Enchante's primary supplier, La Biothetique.  The consignment arrangements resulted in inflated sales because sales were recognized when product was shipped, but retail stores had no

obligation to pay for the products prior to their sale to the end-user or customer.
The business valuation was grossly inflated and did not rely upon any recognized
valuation methodology or reasonable valuation assumptions.  Lamus knew, at the
time of the sale of the securities, that the company had engaged in questionable
sales practices.  These questionable sales practices involved the sale of goods on
credit to retailers which were either a poor credit risk or known to be uncollectible.

164.   In soliciting the investment to Fernau, Lamus provided, in a March 1,
2017 email communication, that:

A. Enchante had a one million two hundred fifty thousand dollar
($1,250,000.00) valuation.

B. At least fifty percent (50%) of the initial investment by Fernau would
remain in the company.

165.   The foregoing statements were false and materially misleading when
made.  This valuation was grossly inflated and did not rely upon any recognized
valuation methodology or reasonable assumptions.  Fifty percent (50%) of the
initial investment did not remain within the company, but was quickly spent,
including for payment of such items as Lamus' claims for past due personal salary
and expenses.

166.   In the sale of securities to Fernau, Lamus distributed, on March 3,
2017, a copy of the Investment Memo, Executive Summary, the same or similar as

was presented to Mateu.  The disclosures contained in the document were materially false and misleading and/or the document contained forecasts and assumptions which lacked any reasonable basis in fact.  Such misrepresentations and omissions included:

A. The business provides approximately thirty percent (~30%) operating profit and strong free cash flow of about twenty percent (~20%).

B. Over eight hundred sixty thousand dollars ($860,000.00) was invested on or before August of 2015 into Enchante.

C. That investors should expect full payback or return of their capital within fifty (50) months, including dividend payouts of two million dollars ($2,000,000.00) per year by 2019.

D. The business would reach a valuation of thirty-eight to fifty-two million dollars ($38,000,000.00 - $52,000,000.00).

E. That sales should be expected per salon conservatively of two thousand dollars ($2,000.00) per month, with the better producing salons to exceed ten thousand dollars per month ($10,000.00).

F. That the company could be expected to deliver over one hundred million dollars ($100,000,000.00) in revenue within ten (10) years.

G. Because of a lean organizational structure, positive cash flow would be expected within six (6) months.

H. That the "project has attractive investment considerations that provide significant upside potential at minimum risk."

I.  The company yields large cash flows, very high returns, and has great scalability.

J.  Fundraising would be mostly allocated to working capital, hiring personnel, and marketing; thus "limiting any risk."

K. Revenue forecasts were made of ten million ($10,000,000.00) and thirty million dollars ($30,000.000.00) in years three (3) and four (4), respectively.

L.  Operating profit forecasts were made of two million ($2,000,000.00) and seven million dollars ($7,000,000.00) in years three (3) and four (4), respectively.

M. Three hundred thousand dollars ($300,000.00) was already committed in the current round of capital raising.

N. An expected return of five times (5x) could be achieved within five (5) years.

O. The use of funds would include six hundred thousand dollars ($600,000.00) into the development of a Florida flagship store and two hundred thousand dollars ($200,000.00) into new product.

167.    By March of 2017, Enchante was already on the verge of collapse. Not only were the foregoing statements false and materially misleading when made, but by 2017, it was known that such statements had no reasonable basis in fact.  Enchante had never reached a point of profitability for which dividends could be paid.  Per store sales were dismissal and nowhere near the two thousand ($2,000.00) to ten thousand dollar ($10,000.00) per month estimates.  The use of proceeds did not follow the representations made and instead, Lamus received substantial payments from Enchante for his personal salary, lavish travel, and meals and entertainment.

168.    On March 6, 2017, Lamus, in soliciting the investment to Fernau, made additional statements which were false and/or Lamus was reckless when making such statements.  Such false statements and/or misstatements included:

A. Based on an initial investment of one hundred twenty-five thousand dollars ($125,000.00), Mr. Fernau could expect a forty-five to seventy percent (45-70%) cumulative annual growth rate and return of two hundred fifty-six thousand ($256,000.00) to four hundred ninety-three thousand dollars ($493,000.00) in three (3) years.

B. Mr. Fernau, in addition to the growth rate of the investment, could expect ten percent (10%) annual returns by dividends.

C. In a "base case scenario," Enchante would have a valuation of over two million nine hundred thousand dollars ($2,900,000.00) and, in a "best case scenario," that valuation would rise to almost four million dollars ($4,000,000.00) in three (3) years.

169. By 2017, Enchante had nominal value because of its mounting liabilities. Lamus was personally aware of the impossibility of reaching his prior sales and growth forecasts, yet continued to make such unsupportable representations to Fernau.

170. Lamus' untrue statements of material fact and omissions to disclose material facts in connection with the sale of the securities to Fernau constitute devices, schemes, and artifices to defraud and constitute acts, practices, or courses of conduct which operated as fraud or deceit within the meaning of §10(b) of the Exchange Act and promulgated Rule 10b-5 thereunder.

171. Had Lamus made full and accurate disclosure at the time of the sale of the securities, Fernau would not have invested into the company. Fernau's reliance was also reasonable. Lamus was the chief executive officer and a director and therefore had access to the books and records of Enchante.

172. The untrue statements and omissions of material fact were the proximate cause of Fernau's loss. Due to the poor financial state of the company, Enchante failed less than one year after Fernau's investment. At the time of

Fernau's investment, Enchante was already on the verge of collapse due to its failure to develop revenue channels and substantial, unpaid liabilities.

173.   Lamus and Enchante acted with scienter in the consummation of their fraudulent scheme.  The omissions and misrepresentations were not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care and misled Fernau.  Lamus was personally aware of the poor financial condition of Enchante as he was the chief executive officer and director and was primarily responsible for the creation and maintenance of the books and records of the company.  Further, Fernau's funds were immediately used to pay such expenses as Lamus' own personal compensation.

## COUNT VIII
## COMMON LAW FRAUD
(Mateu vs. All Defendants)

174.   The allegations contained in paragraphs 1 through 34 are hereby incorporated by reference as if such were restated in full.

175.   Defendants have committed common law fraud because they have (i) made false statements of fact, (ii) made for the purpose of inducing Mateu to act, (iii) Mateu justifiably relied upon the false statements, and (iv) Mateu has suffered damages as a result.

176.   In August of 2015, Lamus and Rey solicited Mateu for the investment of one hundred thousand dollars ($100,000.00) into Enchante.  The investment was

solicited with material misstatements and omissions in violation of both state and federal securities laws.

177.   The misrepresentations and omissions occurred on or about August 5, 2015.  Rey first presented the success of Enchante and its cosmetics business to Mateu.  Lamus subsequently organized two in-person meetings in Miami for the purpose of solicitation and sale of the investment to Mateu.

178.   In soliciting the investment to Mateu, Lamus and Rey relied upon the means and instrumentality of interstate commerce, including wire communications. Communications were made by telephone and electronic instant messaging, in and around August of 2015, to promote Enchante and the sale of the investment to Mateu.

179.   Although the subscription agreement states that Mateu had been provided with "an opportunity to discuss with management of the Company and to ask questions about the Company's current and prospective financial condition, assets and liabilities, business operations, sales, sales prospects, strategic initiatives and business plans," the information provided by Lamus and Rey was materially false and misleading and they omitted to disclose all material information in connection with the sale of the securities.  Such misrepresentations and omissions included:

A. Enchante was an established, operating business generating substantial cash flows.

B. The company was approximately breaking even financially with revenues meeting expenses.

C. A six to eight percent (6 – 8%) dividend would be expected for 2016.

D. The company reached a valuation of between one million two hundred fifty thousand dollars ($1,250,000.00) and two million three hundred thousand dollars ($2,300,000.00).

E. The use of proceeds of Mateu's investment would primarily be used to fund Enchante's operations and not paid out to Lamus personally.

F. Enchante already had substantially more investment committed by other parties.

180. The foregoing statements were false. Enchante was a startup business. Cash flows were negative and the survival of the company relied upon use of new investors' funds. Enchante was experiencing heavy financial losses. No dividend could or would be declared. This business valuation was grossly inflated and did not rely upon any recognized valuation methodology. Lamus and Rey intended to use Mateu's investment funds for their personal benefit.

181. In connection with the sale of the securities to Mateu, Defendants relied upon a document entitled Investment Memo, Executive Summary or a

document similar thereto.  The disclosures contained in the document were materially false and misleading and/or the document contained forecasts and assumptions which lacked any reasonable basis in fact.  Such misrepresentations and omissions included:

A. The business provided approximately thirty percent (~30%) operating profit and strong free cash flow of about twenty percent (~20%).

B. Over eight hundred sixty thousand dollars ($860,000.00) was invested on or before August of 2015 into Enchante.

C. Investors should expect full payback or return of their capital within fifty (50) months, including dividend payouts of two million dollars ($2,000,000.00) per year by 2019.

D. The business would reasonably reach a valuation of thirty-eight to fifty-two million dollars ($38,000,000.00 - 52,000,000.00).

E. That sales should be expected per salon conservatively of two thousand dollars ($2,000.00) per month, with the better producing salons to exceed ten thousand dollars ($10,000.00) per month.

F. That the company could be expected to deliver over one hundred million dollars ($100,000,000.00) in revenue within ten (10) years.

G. Because of a lean organizational structure, positive cash flow would be expected within six (6) months.

H. That the "project has attractive investment considerations that provide significant upside potential at minimum risk."

I. The company yields large cash flows, very high returns, and has great scalability.

J. Fundraising will be mostly allocated to working capital, hiring personnel, and marketing; thus "limiting any risk."

K. Revenue forecasts were made of ten million ($10,000,000.00) and thirty million dollars ($30,000,000.00) in years three (3) and four (4), respectively.

L. Operating profit forecasts were made of two million ($2,000,000.00) and seven million dollars ($7,000,000.00) in years three (3) and four (4), respectively.

M. Three hundred thousand dollars ($300,000.00) was already committed in the current round of capital raising.

N. An expected return of five times (5x) could be achieved within five (5) years.

O. The use of funds would include six hundred thousand dollars ($600,000.00) into the development of a Florida flagship store and two hundred thousand dollars ($200,000.00) into new product.

182.   Upon information and belief, the foregoing representations were false and/or materially misleading.  Enchante had never reached a point of profitability. It was therefore unreasonable to expect any substantial returns or dividends in the foreseeable future, much less support the multi-million dollar valuations Lamus presented.  The use of proceeds was not accurately described.  Instead, investor funds were distributed to pay for such items as Lamus' personal salary, lavish travel expense, and personal meals and entertainment.  The eight hundred sixty thousand dollars ($860,000.00) of purported invested capital, as of August 2015, was not true.  Sales per salon had not "conservatively" reached two thousand dollars ($2,000.00) per month nor the ten thousand dollars ($10,000.00) per month represented.  The purported Florida flag ship store was never created nor was two hundred thousand dollars ($200,000.00) invested into new product.

183.   In connection with the sale of the securities to Mateu, Defendants relied upon a document entitled Strategic Channels NWA Presentation or a document similar thereto.  The disclosures contained in the document were materially false and misleading and/or the document contained forecasts and assumptions which lacked any reasonable basis in fact.  Such misrepresentations and omissions included:

A. Sales were expected to reach three million dollars ($3,000.000.00) in 2017 and twenty-six million dollars ($26,000,000.00) in 2019.

B.  After tax profit was expected to reach six hundred thousand dollars ($600,000.00) in 2017 and six million seven hundred thousand dollars ($6,700,000.00) in 2019.

C.  Cash flows were expected to reach four hundred thousand dollars ($400,000.00) in 2017 and five million seven hundred thousand dollars ($5,700,000.00) in 2019.

D.  Dividends were expected to be paid in the amounts of four hundred thousand dollars ($400,000.00) in 2017 and three million seven hundred thousand dollars ($3,700,000.00) in 2019.

E.  The results identified in subparagraphs A through D could be achieved with only one million four hundred thousand dollars ($1,400,000.00) of invested capital.

F.  Valuations could be supported with a thirty-eight percent (38%) discounted cash flow rate.

G.  The company carried a two million three hundred thousand ($2,300,000.00) pre-money valuation in 2015.

H.  Investors could expect a five times (5x) return in only five (5) years.

I.  That the use of proceeds would include five hundred thousand dollars ($500,000.00) into product inventory and store development in Florida, New York, Massachusetts, and Louisiana, one hundred fifty thousand dollars

($150,000.00) into a Florida flagship academy, one hundred fifty thousand dollars ($150,000.00) into a Colombia and second flagship store, and two hundred thousand dollars ($200,000.00) into development of distribution channels through luxury department stores.

J.   The company could become a one hundred-million-dollar ($100,000,000.00) distribution business in the Americas within five (5) years.

K.  Thirty percent (30%) operating profit could be expected.

184.   Upon information and belief, the foregoing representations were materially false and misleading when made.  The revenue and profitability forecasts, as well as the corresponding company valuations, did not rely upon any recognized methodology or reasonable assumptions.  Enchante had never reached a point of profitability.  It was therefore unreasonable to expect payment of dividends to investors in the foreseeable future.  The use of proceeds was not accurately described.  Five hundred thousand dollars ($500,000.00) was not invested into product inventory nor was an additional one hundred fifty thousand dollars ($150,000.00) invested for the creation of any flagship store in either the United States or abroad.  Two hundred thousand dollars ($200,000.00) was not invested into the development of distribution channels through luxury department stores.

185.   Lamus and Rey were aware of the poor financial performance of Enchante at the time of sale, or were severely reckless in not knowing, but failed to disclose the particular risk factors to Mateu as well as those negative events that had already materialized by August of 2015.

186.   In December of 2015, Lamus and Rey solicited Mateu for an additional investment of six thousand dollars ($6,000) into Enchante.

187.   The investment was also solicited with material misstatements and omissions.  Both Lamus and Rey were aware, or were severely reckless in not knowing, of the poor and deteriorating financial condition of Enchante in December of 2015, but failed to disclose that information at the time of the sale of the securities to Mateu.

188.   Among such misrepresentations and omissions, Lamus and Rey were aware of the substantial losses being incurred by Enchante in 2015.  They further failed to correct their misrepresentations and omissions made in August of 2015 regarding the success of Enchante.

189.   Had Lamus made full and accurate disclosure at the time of the sale of the securities, Mateu would not have invested into the company.  Mateu's reliance was also justifiable.  Lamus was the chief executive officer and a director and therefore had access to the books and records of Enchante.  Rey is Lamus' wife and functioned as a sales agent and promotor of her husband's company.

190.   The untrue statements and omissions of material fact were the proximate cause of Mateu's loss.  Due to the poor financial state of the company, Enchante failed within two (2) years of Mateu's investment.

## COUNT IX
## COMMON LAW FRAUD
### (Fernau vs. Lamus and Enchante)

191.   The allegations contained in paragraphs 1 through 34 are hereby incorporated by reference as if such were restated in full.

192.   Lamus and Enchante have committed common law fraud because they have (i) made false statements of fact, (ii) made for the purpose of inducing Fernau to act, (iii) Fernau justifiably relied upon the false statements, and (iv) Fernau has suffered damages as a result.

193.   Between February and March of 2017, Lamus solicited Fernau for the investment of sixty-two thousand five hundred dollars ($62,500.00) into Enchante.

194.   Much the same as Mateu, the Fernau investment was solicited and sold with material misstatements and omissions of material fact.  Lamus was aware of the poor and deteriorating financial performance of Enchante and substantial, unpaid liabilities, but failed to disclose this information at the time of the sale of the securities.

195.   Although the subscription agreement states that Fernau had been provided with "access to all information, including financial statements and other

financial information of the Company, and has been afforded an opportunity to ask questions of and receive answers from the Company," the information he had received from Lamus, on behalf of Enchante, was false and materially misleading. These misrepresentations and omissions included:

A. Lamus represented that Enchante was at a break-even point financially whereby revenues were approximately equal to expenses being incurred.

B. Lamus failed to disclose material liabilities Enchante had when he solicited and sold the investment.

C. Lamus misrepresented the existence of sales of Enchante as a result of one or more consignment agreements.  These consignment agreement(s) were structured whereby Enchante would provide its inventory to be held in retail stores, but such were neither sales nor should have been counted as revenue when the product was delivered.

D. Lamus represented that Enchante, at the time of sale, had a valuation of one million two hundred fifty thousand dollars ($1,250,000.00) or more.

E. Lamus failed to disclose that the financial statements of Enchante did not comport with Generally Accepted Accounting Principles (GAAP).

F. Lamus failed to disclose problems in Enchante's sales and distribution structure.

G. Lamus failed to disclose that on or about October 17, 2016, Fernando Mateu and his wife requested rescission of their 2015 securities purchases.

H. Lamus failed to disclose that in response to the October 17, 2016 request for rescission by Mateu, Lamus disclosed the lack of liquidity and insolvency of Enchante, but sought to operate a ponzi scheme and thereby payback Mateu's investment with the use of new investors' funds.

196.   The foregoing statements were false and/or materially misleading. Enchante was incurring substantial losses when the sale of the securities occurred. Enchante had unpaid and substantial liabilities, including unpaid taxes in Colombia and unpaid accounts payable and royalties to Enchante's primary supplier, La Biothetique.  The consignment arrangements resulted in inflated sales because sales were recognized when product was shipped, but retail stores had no obligation to pay for the products prior to their sale to the end-user or customer. The business valuation was grossly inflated and did not rely upon any recognized valuation methodology or reasonable valuation assumptions.  Lamus knew, at the time of the sale of the securities, that the company had engaged in questionable sales practices.  These questionable sales practices involved the sale of goods on credit to retailers which were either a poor credit risk or known to be uncollectible.

197.   In soliciting the investment to Fernau, Lamus provided, in a March 1, 2017 email communication, that:

A. Enchante had a one million two hundred fifty thousand dollar ($1,250,000.00) valuation.

B. At least fifty percent (50%) of the initial investment by Fernau would remain in the company.

198.   The foregoing statements were false and materially misleading when made.  This valuation was grossly inflated and did not rely upon any recognized valuation methodology or reasonable assumptions.  Fifty percent (50%) of the initial investment did not remain within the company, but was quickly spent, including for payment of such items as Lamus' claims for past due personal salary and expenses.

199.   In the sale of securities to Fernau, Lamus distributed, on March 3, 2017, a copy of the Investment Memo, Executive Summary, the same or similar as was presented to Mateu.  The disclosures contained in the document were materially false and misleading and/or the document contained forecasts and assumptions which lacked any reasonable basis in fact.  Such misrepresentations and omissions included:

A. The business provides approximately thirty percent (~30%) operating profit and strong free cash flow of about twenty percent (~20%).

B. Over eight hundred sixty thousand dollars ($860,000.00) was invested on or before August of 2015 into Enchante.

C.  That investors should expect full payback or return of their capital within fifty (50) months, including dividend payouts of two million dollars ($2,000,000.00) per year by 2019.

D.  The business would reach a valuation of thirty-eight to fifty-two million dollars ($38,000,000.00 - $52,000,000.00).

E.  That sales should be expected per salon conservatively of two thousand dollars ($2,000.00) per month, with the better producing salons to exceed ten thousand dollars per month ($10,000.00).

F.  That the company could be expected to deliver over one hundred million dollars ($100,000,000.00) in revenue within ten (10) years.

G.  Because of a lean organizational structure, positive cash flow would be expected within six (6) months.

H.  That the "project has attractive investment considerations that provide significant upside potential at minimum risk."

I.  The company yields large cash flows, very high returns, and has great scalability.

J.  Fundraising would be mostly allocated to working capital, hiring personnel, and marketing; thus "limiting any risk."

K. Revenue forecasts were made of ten million ($10,000,000.00) and thirty million dollars ($30,000.000.00) in years three (3) and four (4), respectively.

L. Operating profit forecasts were made of two million ($2,000,000.00) and seven million dollars ($7,000,000.00) in years three (3) and four (4), respectively.

M. Three hundred thousand dollars ($300,000.00) was already committed in the current round of capital raising.

N. An expected return of five times (5x) could be achieved within five (5) years.

O. The use of funds would include six hundred thousand dollars ($600,000.00) into the development of a Florida flagship store and two hundred thousand dollars ($200,000.00) into new product.

200.   By March of 2017, Enchante was already on the verge of collapse. Not only were the foregoing statements false and materially misleading when made, but by 2017, it was known that such statements had no reasonable basis in fact.  Enchante had never reached a point of profitability for which dividends could be paid.  Per store sales were dismissal and nowhere near the two thousand ($2,000.00) to ten thousand dollar ($10,000.00) per month estimates.  The use of proceeds did not follow the representations made and instead, Lamus received

substantial payments from Enchante for his personal salary, lavish travel, and meals and entertainment.

201.   On March 6, 2017, Lamus, in soliciting the investment to Fernau, made additional statements which were false and/or Lamus was reckless when making such statements.  Such false statements and/or misstatements included:

A.   Based on an initial investment of one hundred twenty-five thousand dollars ($125,000.00), Mr. Fernau could expect a forty-five to seventy percent (45-70%) cumulative annual growth rate and return of two hundred fifty-six thousand ($256,000.00) to four hundred ninety-three thousand dollars ($493,000.00) in three (3) years.

B. Mr. Fernau, in addition to the growth rate of the investment, could expect ten percent (10%) annual returns by dividends.

C. In a "base case scenario," Enchante would have a valuation of over two million nine hundred thousand dollars ($2,900,000.00) and, in a "best case scenario," that valuation would rise to almost four million dollars ($4,000,000.00) in three (3) years.

202.   By 2017, Enchante had nominal value because of its mounting liabilities.  Lamus was personally aware of the impossibility of reaching his prior sales and growth forecasts, yet continued to make such unsupportable representations to Fernau.

203.    Had Lamus made full and accurate disclosure at the time of the sale of the securities, Fernau would not have invested into the company.  Fernau's reliance was also justifiable.  Lamus was the chief executive officer and a director and therefore had access to the books and records of Enchante.

204.    The untrue statements and omissions of material fact were the proximate cause of Fernau's loss.  Due to the poor financial state of the company, Enchante failed less than one year after Fernau's investment.

## COUNT X
## VIOLATION OF THE CIVIL REMEDIES FOR CRIMINAL PRACTICES ACT
### (Fla. Stat. §772.101, et. seq.)
(All Plaintiffs vs. All Defendants)

205.    The allegations contained in paragraphs 1 through 204 are hereby incorporated by reference as if such were restated in full.

206.    Fla. Stat. §895.03 provides that is unlawful for any person (i) who has with criminal intent received any proceeds derived, directly or indirectly, from a pattern of racketeering activity to use or invest any part of such proceeds in the establishment or operation of any enterprise, (ii) through a pattern of racketeering activity to acquire or maintain, directly or indirectly, any interest in or control of any enterprise, (iii) to conduct or participate, directly or indirectly, in such enterprise through a pattern of racketeering activity, or (iv) to conspire or endeavor to violate any provisions of Fla. Stat. §895.03(1-3).

207.   A "pattern of racketeering" means engaging in at least two incidents of racketeering conduct that have the same or similar intents, results, accomplices, victims, or methods of commission or that otherwise are interrelated by distinguishing characteristics and are not isolated incidents, provided at least one of such incidents occurred after October 1, 1977, and that the last of such incidents occurred within five (5) years after a prior incident of racketeering conduct. Fla. Stat. §895.02(7).

208.   The Civil Remedies for Criminal Practices Act ("**CRCPA**" or the "**Florida Civil RICO**"), Fla. Stat. §772.101, *et. seq*., extends liability for racketeering to a tort claim and thereby permits a private right of action for ongoing criminal activity.

209.   Fla. Stat. §772.102(1)(a)(5) expressly allows claims for securities violations and provides that "criminal activity" means to attempt to commit, to conspire to commit, or to solicit, coerce, or intimidate another person to commit……. any crime that is chargeable by indictment or information under…….. Chapter 517, relating to securities transactions.

210.   A "pattern of criminal activity" is similarly defined under the CRCPA and means engaging in at least two incidents of criminal activity that have the same or similar intents, results, accomplices, victims, or methods of commission or that otherwise are interrelated by distinguishing characteristics and are not isolated

incidents; provided that the last of such incidents occurred within five (5) years after a prior incident of criminal activity. Fla. Stat. §772.102(4).

211.   Defendants Lamus, Rey, and Enchante formed an "enterprise" within the meaning of Fla. Stat. §772.102(3) because Lamus and Rey are individuals and Enchante a corporation; which together associated in fact and created the resulting criminal enterprise.

212.   Defendant Lamus formed a part of the criminal enterprise because he committed crimes chargeable by indictment under Chapter 517 of the Florida Statutes.  Lamus directly benefitted from the proceeds of the criminal activity because investor funds, including those of Plaintiffs, were funneled through Enchante to pay for such items as Lamus' personal salary, lavish travel, and meals and entertainment.  Lamus' involvement in the criminal conspiracy exceeded his role as only agent of Enchante and therefore Lamus, in his individual capacity, became associated in fact with the enterprise.

213.   Defendant Rey formed part of the criminal enterprise because she committed crimes chargeable by indictment under Chapter 517 of the Florida Statutes.  Upon information and belief, Rey directly benefitted from the proceeds of the criminal activity because investor funds, including those of Plaintiffs, were funneled through Enchante and then Lamus for her personal benefit.  Rey's

involvement in the criminal conspiracy exceeded her role as agent of Enchante and Rey, in her individual capacity, became associated in fact with the enterprise.

214.   Defendant Enchante formed a part of the criminal enterprise because it committed crimes chargeable by indictment under Chapter 517 of the Florida Statutes.  Enchante was the issuer of securities and therefore directly benefitted by the fraudulent sale of its securities because the proceeds of those sales, including those of Plaintiffs' investments, were directed toward the entity.  Enchante's involvement in the criminal conspiracy exceeded its role only as the issuer of fraudulent securities, but it became associated in fact with the Individual Defendants.  The scheme could not have been accomplished only by Enchante and it relied upon the individual participation of Lamus and Rey.

215.   Lamus, Rey, and Enchante conducted or participated in the conduct of the enterprise's affairs, separate and apart from their own affairs.  The enterprise created was therefore separate and distinct from Lamus, Rey, and Enchante.  In other words, the enterprise became the vehicle in which Lamus, Rey, and Enchante joined together to engage in their business of defrauding investors in violation of Florida law.

216.   Defendants actions constituted a "pattern of criminal activity" under Fla. Stat. §772.102(4) because (i) they have engaged in at least two incidents of criminal activity that (ii) had the same or similar intents, results, accomplices,

victims, or methods of commission or that otherwise are interrelated by distinguishing characteristics and are not isolated incidents and (iii) the last of such incidents occurred within five (5) years after a prior incident of criminal activity.

217.   Such predicate acts of criminal activity and crimes supporting this Florida Civil RICO action include those specified under Fla. Stat. §772.102(1)(a)(5) (two or more violations of the Florida Securities and Investor Protection Act, Fla. Stat. §517.301, *et. seq*.,).

218.   Lamus, Rey, and Enchante, as associates of the criminal enterprise, and the resulting enterprise itself, violated Fla. Stat. §517.301 because they have, in connection with the sale of a security, (i) employed a device, scheme, or artifice to defraud, (ii) obtained money or property by means of untrue statements of material fact and omissions to state material facts, and (iii) engaged in a transaction, practice, or course of business which operated as a fraud or deceit upon Plaintiffs.

**Florida Civil RICO Violations involving Mateu**

219.   Fla. Stat. §517.301 provides that it is unlawful and a violation of Chapter 517 of the Florida Code for a person, in connection with the offer, sale, or purchase of any investment or security (i) to employ any device, scheme, or artifice to defraud, (ii) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the

statements made, in the light of the circumstances under which they were made, not misleading, or (iii) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a person.

220.   Lamus, Rey, and Enchante, by and through Lamus as chief executive officer and a director and Rey as sales agent of securities, violated §517.301 because they, in connection with the sale of a security, (i) employed a device, scheme, or artifice to defraud, (ii) obtained money or property by means of untrue statements of material fact and omissions to state material facts, and (iii) engaged in a transaction, practice, or course of business which operated as a fraud or deceit upon Mateu.

221.   In August of 2015, Lamus and Rey solicited Mateu for the investment of one hundred thousand dollars ($100,000.00) into Enchante.  The investment was solicited with material misstatements and omissions in violation of both state and federal securities laws.

222.   The misrepresentations and omissions occurred on or about August 5, 2015.  Rey first presented the success of Enchante and its cosmetics business to Mateu.  Lamus subsequently organized two in-person meetings in Miami for the purpose of solicitation and sale of the investment to Mateu.

223.   In soliciting the investment to Mateu, Lamus and Rey relied upon the means and instrumentality of interstate commerce, including wire communications.

Communications were made by telephone and electronic instant messaging, in and around August of 2015, to promote Enchante and the sale of the investment to Mateu.

224.   Although the subscription agreement states that Mateu had been provided with "an opportunity to discuss with management of the Company and to ask questions about the Company's current and prospective financial condition, assets and liabilities, business operations, sales, sales prospects, strategic initiatives and business plans," the information provided by Lamus and Rey was materially false and misleading and they omitted to disclose all material information in connection with the sale of the securities.  Such misrepresentations and omissions included:

A. Enchante was an established, operating business generating substantial cash flows.

B.  The company was approximately breaking even financially with revenues meeting expenses.

C.  A six to eight percent (6 – 8%) dividend would be expected for 2016.

D.  The company reached a valuation of between one million two hundred fifty thousand dollars ($1,250,000.00) and two million three hundred thousand dollars ($2,300,000.00).

E. The use of proceeds of Mateu's investment would primarily be used to fund Enchante's operations and not paid out to Lamus personally.

F. Enchante already had substantially more investment committed by other parties.

225.   The foregoing statements were false.  Enchante was a startup business.  Cash flows were negative and the survival of the company relied upon use of new investors' funds.  Enchante was experiencing heavy financial losses. No dividend could or would be declared.  This business valuation was grossly inflated and did not rely upon any recognized valuation methodology.  Lamus and Rey intended to use Mateu's investment funds for their personal benefit.

226.   In connection with the sale of the securities to Mateu, Defendants relied upon a document entitled Investment Memo, Executive Summary or a document similar thereto.  The disclosures contained in the document were materially false and misleading and/or the document contained forecasts and assumptions which lacked any reasonable basis in fact.  Such misrepresentations and omissions included:

A. The business provided approximately thirty percent (~30%) operating profit and strong free cash flow of about twenty percent (~20%).

B. Over eight hundred sixty thousand dollars ($860,000.00) was invested on or before August of 2015 into Enchante.

C.  Investors should expect full payback or return of their capital within fifty (50) months, including dividend payouts of two million dollars ($2,000,000.00) per year by 2019.

D.  The business would reasonably reach a valuation of thirty-eight to fifty-two million dollars ($38,000,000.00 - 52,000,000.00).

E.  That sales should be expected per salon conservatively of two thousand dollars ($2,000.00) per month, with the better producing salons to exceed ten thousand dollars ($10,000.00) per month.

F.  That the company could be expected to deliver over one hundred million dollars ($100,000,000.00) in revenue within ten (10) years.

G.  Because of a lean organizational structure, positive cash flow would be expected within six (6) months.

H.  That the "project has attractive investment considerations that provide significant upside potential at minimum risk."

I.   The company yields large cash flows, very high returns, and has great scalability.

J.   Fundraising will be mostly allocated to working capital, hiring personnel, and marketing; thus "limiting any risk."

K. Revenue forecasts were made of ten million ($10,000,000.00) and thirty million dollars ($30,000,000.00) in years three (3) and four (4), respectively.

L. Operating profit forecasts were made of two million ($2,000,000.00) and seven million dollars ($7,000,000.00) in years three (3) and four (4), respectively.

M. Three hundred thousand dollars ($300,000.00) was already committed in the current round of capital raising.

N. An expected return of five times (5x) could be achieved within five (5) years.

O. The use of funds would include six hundred thousand dollars ($600,000.00) into the development of a Florida flagship store and two hundred thousand dollars ($200,000.00) into new product.

227.   Upon information and belief, the foregoing representations were false and/or materially misleading.  Enchante had never reached a point of profitability. It was therefore unreasonable to expect any substantial returns or dividends in the foreseeable future, much less support the multi-million dollar valuations Lamus presented.  The use of proceeds was not accurately described.  Instead, investor funds were distributed to pay for such items as Lamus' personal salary, lavish travel expense, and personal meals and entertainment.  The eight hundred sixty

thousand dollars ($860,000.00) of purported invested capital, as of August 2015, was not true.  Sales per salon had not "conservatively" reached two thousand dollars ($2,000.00) per month nor the ten thousand dollars ($10,000.00) per month represented.  The purported Florida flag ship store was never created nor was two hundred thousand dollars ($200,000.00) invested into new product.

228.   In connection with the sale of the securities to Mateu, Defendants relied upon a document entitled Strategic Channels NWA Presentation or a document similar thereto.  The disclosures contained in the document were materially false and misleading and/or the document contained forecasts and assumptions which lacked any reasonable basis in fact.  Such misrepresentations and omissions included:

A. Sales were expected to reach three million dollars ($3,000.000.00) in 2017 and twenty-six million dollars ($26,000,000.00) in 2019.

B. After tax profit was expected to reach six hundred thousand dollars ($600,000.00) in 2017 and six million seven hundred thousand dollars ($6,700,000.00) in 2019.

C. Cash flows were expected to reach four hundred thousand dollars ($400,000.00) in 2017 and five million seven hundred thousand dollars ($5,700,000.00) in 2019.

D. Dividends were expected to be paid in the amounts of four hundred thousand dollars ($400,000.00) in 2017 and three million seven hundred thousand dollars ($3,700,000.00) in 2019.

E. The results identified in subparagraphs A through D could be achieved with only one million four hundred thousand dollars ($1,400,000.00) of invested capital.

F. Valuations could be supported with a thirty-eight percent (38%) discounted cash flow rate.

G. The company carried a two million three hundred thousand ($2,300,000.00) pre-money valuation in 2015.

H. Investors could expect a five times (5x) return in only five (5) years.

I. That the use of proceeds would include five hundred thousand dollars ($500,000.00) into product inventory and store development in Florida, New York, Massachusetts, and Louisiana, one hundred fifty thousand dollars ($150,000.00) into a Florida flagship academy, one hundred fifty thousand dollars ($150,000.00) into a Colombia and second flagship store, and two hundred thousand dollars ($200,000.00) into development of distribution channels through luxury department stores.

J.   The company could become a one hundred-million-dollar ($100,000,000.00) distribution business in the Americas within five (5) years.

K.   Thirty percent (30%) operating profit could be expected.

229.   Upon information and belief, the foregoing representations were materially false and misleading when made.  The revenue and profitability forecasts, as well as the corresponding company valuations, did not rely upon any recognized methodology or reasonable assumptions.  Enchante had never reached a point of profitability.  It was therefore unreasonable to expect payment of dividends to investors in the foreseeable future.  The use of proceeds was not accurately described.  Five hundred thousand dollars ($500,000.00) was not invested into product inventory nor was an additional one hundred fifty thousand dollars ($150,000.00) invested for the creation of any flagship store in either the United States or abroad.  Two hundred thousand dollars ($200,000.00) was not invested into the development of distribution channels through luxury department stores.

230.   Lamus and Rey were aware of the poor financial performance of Enchante at the time of sale, or were severely reckless in not knowing, but failed to disclose the particular risk factors to Mateu as well as those negative events that had already materialized by August of 2015.

231.   In December of 2015, Lamus and Rey solicited Mateu for an additional investment of six thousand dollars ($6,000) into Enchante.

232.   The investment was also solicited with material misstatements and omissions.  Both Lamus and Rey were aware, or were severely reckless in not knowing, of the poor and deteriorating financial condition of Enchante in December of 2015, but failed to disclose that information at the time of the sale of the securities to Mateu.

233.   Among such misrepresentations and omissions, Lamus and Rey were aware of the substantial losses being incurred by Enchante in 2015.  They further failed to correct their misrepresentations and omissions made in August of 2015 regarding the success of Enchante.

234.   Had Lamus and Rey made full and accurate disclosure at the time of the sale of the securities, Mateu would not have invested into the company. Mateu's reliance was also reasonable.  Lamus was the chief executive officer and a director and therefore had access to the books and records of Enchante.  Rey is Lamus' wife and functioned as a sales agent and promotor of her husband's company.

235.   The untrue statements and omissions of material fact were the proximate cause of Mateu's loss.  Due to the poor financial state of the company, Enchante failed within two (2) years of Mateu's investment.

## Florida CIVIL RICO Violations Involving Fernau

236.   Fla. Stat. §517.301 provides that it is unlawful and a violation of Chapter 517 of the Florida Code for a person, in connection with the offer, sale, or purchase of any investment or security (i) to employ any device, scheme, or artifice to defraud, (ii) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (iii) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a person.

237.   Lamus and Enchante, by and through Lamus as chief executive officer and a director, violated §517.301 because they, in connection with the sale of a security, (i) employed a device, scheme, or artifice to defraud, (ii) obtained money or property by means of untrue statements of material fact and omissions to state material facts, and (iii) engaged in a transaction, practice, or course of business which operated as a fraud or deceit upon Fernau.

238.   Between February and March of 2017, Lamus solicited Fernau for the investment of sixty-two thousand five hundred dollars ($62,500.00) into Enchante.

239.   Much the same as Mateu, the Fernau investment was solicited and sold with material misstatements and omissions of material fact.  Lamus was aware of the poor and deteriorating financial performance of Enchante and substantial,

unpaid liabilities, but failed to disclose this information at the time of the sale of the securities.

240.   Although the subscription agreement states that Fernau had been provided with "access to all information, including financial statements and other financial information of the Company, and has been afforded an opportunity to ask questions of and receive answers from the Company," the information he had received from Lamus, on behalf of Enchante, was false and materially misleading. These misrepresentations and omissions included:

A. Lamus represented that Enchante was at a break-even point financially whereby revenues were approximately equal to expenses being incurred.

B. Lamus failed to disclose material liabilities Enchante had when he solicited and sold the investment.

C. Lamus misrepresented the existence of sales of Enchante as a result of one or more consignment agreements.  These consignment agreement(s) were structured whereby Enchante would provide its inventory to be held in retail stores, but such were neither sales nor should have been counted as revenue when the product was delivered.

D. Lamus represented that Enchante, at the time of sale, had a valuation of one million two hundred fifty thousand dollars ($1,250,000.00) or more.

E. Lamus failed to disclose that the financial statements of Enchante did not comport with Generally Accepted Accounting Principles (GAAP).

F. Lamus failed to disclose problems in Enchante's sales and distribution structure.

G. Lamus failed to disclose that on or about October 17, 2016, Fernando Mateu and his wife requested rescission of their 2015 securities purchases.

H. Lamus failed to disclose that in response to the October 17, 2016 request for rescission by Mateu, Lamus disclosed the lack of liquidity and insolvency of Enchante, but sought to operate a ponzi scheme and thereby payback Mateu's investment with the use of new investors' funds.

241. The foregoing statements were false and/or materially misleading. Enchante was incurring substantial losses when the sale of the securities occurred. Enchante had unpaid and substantial liabilities, including unpaid taxes in Colombia and unpaid accounts payable and royalties to Enchante's primary supplier, La Biothetique. The consignment arrangements resulted in inflated sales because sales were recognized when product was shipped, but retail stores had no obligation to pay for the products prior to their sale to the end-user or customer. The business valuation was grossly inflated and did not rely upon any recognized valuation methodology or reasonable valuation assumptions. Lamus knew, at the time of the sale of the securities, that the company had engaged in questionable

sales practices.  These questionable sales practices involved the sale of goods on credit to retailers which were either a poor credit risk or known to be uncollectible.

242.   In soliciting the investment to Fernau, Lamus provided, in a March 1, 2017 email communication, that:

A. Enchante had a one million two hundred fifty thousand dollar ($1,250,000.00) valuation.

B. At least fifty percent (50%) of the initial investment by Fernau would remain in the company.

243.   The foregoing statements were false and materially misleading when made.  This valuation was grossly inflated and did not rely upon any recognized valuation methodology or reasonable assumptions.  Fifty percent (50%) of the initial investment did not remain within the company, but was quickly spent, including for payment of such items as Lamus' claims for past due personal salary and expenses.

244.   In the sale of securities to Fernau, Lamus distributed, on March 3, 2017, a copy of the Investment Memo, Executive Summary, the same or similar as was presented to Mateu.  The disclosures contained in the document were materially false and misleading and/or the document contained forecasts and assumptions which lacked any reasonable basis in fact.  Such misrepresentations and omissions included:

A. The business provides approximately thirty percent (~30%) operating profit and strong free cash flow of about twenty percent (~20%).

B. Over eight hundred sixty thousand dollars ($860,000.00) was invested on or before August of 2015 into Enchante.

C. That investors should expect full payback or return of their capital within fifty (50) months, including dividend payouts of two million dollars ($2,000,000.00) per year by 2019.

D. The business would reach a valuation of thirty-eight to fifty-two million dollars ($38,000,000.00 - $52,000,000.00).

E. That sales should be expected per salon conservatively of two thousand dollars ($2,000.00) per month, with the better producing salons to exceed ten thousand dollars per month ($10,000.00).

F. That the company could be expected to deliver over one hundred million dollars ($100,000,000.00) in revenue within ten (10) years.

G. Because of a lean organizational structure, positive cash flow would be expected within six (6) months.

H. That the "project has attractive investment considerations that provide significant upside potential at minimum risk."

I. The company yields large cash flows, very high returns, and has great scalability.

J. Fundraising would be mostly allocated to working capital, hiring personnel, and marketing; thus "limiting any risk."

K. Revenue forecasts were made of ten million ($10,000,000.00) and thirty million dollars ($30,000.000.00) in years three (3) and four (4), respectively.

L. Operating profit forecasts were made of two million ($2,000,000.00) and seven million dollars ($7,000,000.00) in years three (3) and four (4), respectively.

M. Three hundred thousand dollars ($300,000.00) was already committed in the current round of capital raising.

N. An expected return of five times (5x) could be achieved within five (5) years.

O. The use of funds would include six hundred thousand dollars ($600,000.00) into the development of a Florida flagship store and two hundred thousand dollars ($200,000.00) into new product.

245.   By March of 2017, Enchante was already on the verge of collapse. Not only were the foregoing statements false and materially misleading when made, but by 2017, it was known that such statements had no reasonable basis in fact. Enchante had never reached a point of profitability for which dividends could be paid. Per store sales were dismissal and nowhere near the two thousand

($2,000.00) to ten thousand dollar ($10,000.00) per month estimates. The use of proceeds did not follow the representations made and instead, Lamus received substantial payments from Enchante for his personal salary, lavish travel, and meals and entertainment.

246. On March 6, 2017, Lamus, in soliciting the investment to Fernau, made additional statements which were false and/or Lamus was reckless when making such statements. Such false statements and/or misstatements included:

A. Based on an initial investment of one hundred twenty-five thousand dollars ($125,000.00), Mr. Fernau could expect a forty-five to seventy percent (45-70%) cumulative annual growth rate and return of two hundred fifty-six thousand ($256,000.00) to four hundred ninety-three thousand dollars ($493,000.00) in three (3) years.

B. Mr. Fernau, in addition to the growth rate of the investment, could expect ten percent (10%) annual returns by dividends.

C. In a "base case scenario," Enchante would have a valuation of over two million nine hundred thousand dollars ($2,900,000.00) and, in a "best case scenario," that valuation would rise to almost four million dollars ($4,000,000.00) in three (3) years.

247. By 2017, Enchante had nominal value because of its mounting liabilities. Lamus was personally aware of the impossibility of reaching his prior

sales and growth forecasts, yet continued to make such unsupportable representations to Fernau.

248. Had Lamus made full and accurate disclosure at the time of the sale of the securities, Fernau would not have invested into the company. Fernau's reliance was also reasonable. Lamus was the chief executive officer and a director and therefore had access to the books and records of Enchante.

249. The untrue statements and omissions of material fact were the proximate cause of Fernau's loss. Due to the poor financial state of the company, Enchante failed less than one year after Fernau's investment. At the time of Fernau's investment, Enchante was already on the verge of collapse due to its failure to develop revenue channels and substantial, unpaid liabilities.

**Defendants' Violation of the Florida Civil RICO Act**

250. Defendants committed the predicate acts willfully or with actual knowledge of their illegality as their purpose was to execute a scheme or artifice to defraud Plaintiffs. This scheme involved the sale of Enchante securities, by way of material misrepresentations of fact and omissions to disclose material information, in order solicit and sell securities.

251. The conduct of Defendants forms a pattern of racketeering sufficient to support a RICO claim under Florida law.

252.   Defendants engaged in at least two (2) incidents of criminal activity and the last of such incidents occurred within five (5) years after a prior incident of criminal activity.  The criminal activity included the consummation of fraud upon Plaintiffs, in violation of Florida law, in connection with the sale of securities in August of 2015, December of 2015, and March of 2017.

253.   The incidents of criminal activity had the same or similar intents, results, accomplices, victims, or methods of commission or were interrelated by distinguishing characteristics and were not isolated incidents.  The incidents were related to one another and all involved Defendants' associating in fact to form an enterprise for the purpose of the unlawful sale of the securities of Enchante.  The enterprise used the same accomplices (ie. Lamus, Rey, and Enchante), the victims were all investors into private placement securities offerings of Enchante, and the crimes were consummated by similar methods (ie. the use of false and misleading statements and fraudulent sales documentation).  The criminal activity therefore does not constitute isolated instances, but rather is the manner in which the Defendants operated the enterprise.

254.   The predicate acts further constituted criminal conduct of continuing nature.  Defendants have committed these offenses to the Plaintiffs in this action over a period of approximately two (2) years and in three (3) separate securities transactions.  However, Defendants have, upon information and belief, committed

numerous violations of the Florida Securities and Investor Protection Act between 2012 and 2017 and involving the sale of Enchante securities as well as its affiliate and predecessor, Beauty Care Partners Strategic Channels, Inc.  Upon information and belief, other Enchante equity and debt holders were similarly sold investment securities by Defendants with use of fraudulent statements and or/material omissions of fact.  Such defrauded parties are believed to include Alejandro Marmorek and Ruy Chaves of Bratcher Consultants, Inc.

255.   The enterprise formed by Defendants was an ongoing organization, with a common purpose of engaging in a course of conduct, and functioned as a continuing unit.  The criminal activity of Defendants involved violations of Chapter 517 of the Florida Statutes over a several year period and all by way of fraud in connection with the purchase or sale of Enchante or its predecessor's securities.

256.   Plaintiffs are entitled to an award of treble damages and attorney's fees under Fla. Stat. §772.104(1) because of Defendants' violations of the CRCPA.

WHEREFORE, Plaintiffs prays for a judgment in their favor and against Defendants, jointly and severally, in the amount of one hundred sixty-eight thousand five hundred dollars ($168,500), trebled to five hundred five thousand five hundred dollars ($505,500), plus prejudgment interest from the date of sale, and an award of attorneys' fees.

This 21st day of June, 2019.

/s/ Michael Stegawski
Michael Stegawski
Fla Bar No. 51589

Convergent Litigation Associates
1395 Brickell Ave, Suite 800
Miami, FL 33131
T: (800) 750-9861 x101
F: (800) 531-3243
michael@cla-law.com

*Attorney for Plaintiffs*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

JULIAN FERNAU, FERNANDO
MATEU, AND MARIA DOLORES
DE LUCAS,

     *Plaintiffs*,

  v.

                              CASE NO. 1:18-cv-20866-RNS

ENCHANTE BEAUTY PRODUCTS,
INC., RAUL LAMUS, AND MARIA
FERNANDA REY,

     *Defendants*.

## CERTIFICATE OF SERVICE

     I hereby certify that on this 21st day of June, 2019, I electronically filed the within and foregoing with the Clerk of Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notice of Electronic Filing.

                             /s/ Michael Stegawski
                             Michael Stegawski, Esq.

## SERVICE LIST

*Fernau, et. al, v. Enchante Beauty Products, Inc., et. al.*
Case No. 1:18-cv-20866-RNS
United States District Court, Southern District of Florida

| | |
|---|---|
| Brodsky Fotiu-Wojtowicz, PLLC | Convergent Litigation Associates |
| Alaina Fotiu-Wojtowicz | Michael Stegawski |
| 200 SE 1st Street | 1395 Brickell Avenue |

Brodsky Fotiu-Wojtowicz, PLLC
Alaina Fotiu-Wojtowicz
200 SE 1st Street
Suite 400
Miami, FL 33131
Tel: (305) 503-5054
Fax: (786) 749-7644
Email: alaina@bfwlegal.com
        docketing@bfwlegal.com

*Attorney for Raul Lamus and Maria
Fernanda Rey*

(via CM/ECF)


Stephanie Anne Casey
Colson Hicks Eidson
255 Alhambra Circle, PH
Coral Gables, FL 33134
Tel: (305) 476-7400
Fax: (305) 476-7444
Email: scasey@colson.com

*Attorney for Enchante Beauty Products, Inc.*

(via CM/ECF)

Convergent Litigation Associates
Michael Stegawski
1395 Brickell Avenue
Suite 800
Miami, FL 33131
Tel: (800) 750-9861 x101
Fax: (800) 531-3243
Email: michael@cla-law.com

*Attorney for Plaintiffs*

(via CM/ECF)

## **VERIFICATION**

I, Julian Fernau, Plaintiff in the above-styled action, hereby declare, under

penalty of perjury under the laws of the United States of America and pursuant to

28 U.S.C. §1746, that I have read the foregoing Verified Second Amended

Complaint and that the facts stated therein are true and correct.


Julian Fernau

## <u>VERIFICATION</u>

We, Fernando Mateu and Maria Dolores De Lucas, Plaintiffs in the above-styled action, hereby declare, under penalty of perjury and pursuant to 28 U.S.C. §1746, that we have read the foregoing Verified Second Amended Complaint and that the facts stated therein are true and correct.


_____
Fernando Mateu


_____
Maria Dolores de Lucas